INGRAM-DEKLE LUMBER COMPANY, A CORPORATION, *Plaintiff in Error,* v. J. A. GEIGER, *Defendant in Error.*

Opinion filed April 5, 1916.

1. A corporation or company engaged in the operation of a sawmill, and as an incident to such business operates a steam railroad about six or seven miles long, commonly known as a log road, is not "a railroad company" within the terms and meaning of Sections 3148, 3149 and 3150 of the General Statutes of 1906.

2. The common law is in force in this State, except where it has been modified by competent governmental authority.

3. In actions for the recovery of damages to a person or his property, alleged to have been occasioned by the negligence of the defendant, the common law principle which prevents a recovery if the plaintiff's own negligence contributed proximately to his injuries has not been modified or changed, except as modified by Sections 3148, 3149, 3150 of the General Statutes of 1906, and Chapter 6521 of the Acts of 1913.

4. At the common law where the master himself has performed his duty, he is not liable to one of his servants for personal injuries received by such servant in the course of his em-

ployment, through the negligence of a fellow-servant or co-employe of such servant, when engaged in the same undertaking or common work or enterprise, unless such fellow-servant or co-employe sustains a representative relation, such as vice-principal, to the master. This common law principle is in force in this State, except as modified by Sections 3148, 3149, 3150 of the General Statutes of 1906, and Chapter 6521 of the Acts of 1913.

5. In actions for negligent injuries it may be necessary to allege only the relations between the parties out of which the duty to avoid negligence arises, and the act or omission that proximately caused the injury, coupled with a statement that such act or omission was negligently done or omitted.

6. A declaration should contain sufficient allegations of all the facts that are necessary to state a cause of action. As a general rule, only ultimate facts need be alleged.

7. In an action whereby it is sought to recover damages for personal injuries alleged to have been occasioned by the negligence of a railroad company or corporation, a count in the declaration alleging "that the said track and rails were wet, and the said locomotive engine and tender leaked in such a way the water therefrom fell upon the rails of said track, and the sand box on said locomotive engine was in such a defective condition that sand would not fall therefrom upon the rails of said track by reason whereof the said locomotive engine upon which plaintiff was riding could not be stopped and collided with the said derailed locomotive engine," is not demurrable for failing to allege the acts or omissions of the defendant which caused the plaintiff's injuries.

8. Except as modified by statute, an engineer and a track repairer, though in different departments of the railroad company, are fellow-servants engaged in the same common work or enterprise, and where such track repairer, while riding on the engine in charge of such engineer to the place where such track repairer has to work, received injuries by reason of the negligence of such engineer in operating the engine,

there can be no recovery by the track repairer against the railroad company, the engineer not sustaining a representative relation, such as vice-principal, to the defendant company.

9. The *allegata* and *probata* must meet and correspond, the issues being made by the pleadings to which the proofs must be confined. There can be no recovery upon a cause of action, however meritorious it may be, that is in substance variant from that which is pleaded by the plaintiff.

Writ of error to Circuit Court, Pasco County; F. M. Robles, Judge.

Judgment reversed.

*McKay, Withers & Phipps,* for Plaintiff in Error;

*H.‐S. Hampton* and *J. A. Hendley,* for Defendant in Error.

SHACKLEFORD, J.—J. A. Geiger instituted an action at law against the Ingram-Dekle Lumber Company, a corporation, for the recovery of damages for personal injuries alleged to have been sustained by the plaintiff by reason of the negligence of the defendant. The amended declaration consists of two counts, the first of which is as follows:

"Whereas, on the 16th day of September, A. D. 1910, the defendant maintained and operated a railroad known as a log road in Pasco County, State of Florida; and on said date plaintiff was in the employ of the said defendant, and was directed by defendant, with other employes of said defendant, to board a locomotive engine of the defendant, neither the plaintiff nor the said

employes so directed to board the said locomotive engine were employed on or about any locomotive engines or cars of defendant, and they were directed to ride on said locomotive engine to a point on said railroad of said defendant where another locomotive engine of the derendant had been derailed, and to assist the other said employes who boarded said engine with plaintiff in placing the said derailed locomotive on said railroad track; that in consideration of the performances of plaintiff's services in connection with this employment it became and was the duty of the said defendant to use reasonable and proper care to provide the plaintiff with a reasonably safe place in which to work, and not to subject him to any extraordinary hazard or risk in the course of his duty or employment, yet the said defendant heretofore, to-wit, on the 16th day of September, A. D. 1910, not regarding its duty in this behalf did not use reasonable and proper care to provide the plaintiff a reasonably safe place in which to discharge his duties and work, as aforesaid, but wholly failed to do so, and to the contrary did subject him to extraordinary risk and hazard in the course of his duty and employment in this, to-wit; that the said defendant through its agents and employes in charge of the operation of said locomotive engine upon which the plaintiff was then riding, so negligently operated the same that it collided with the said derailed locomotive engine, and just prior to said collision plaintiff and the other said employes, who were employed on or about the said locomotive engine, saw that a collision with said derailed locomotive engine could not be avoided, and in order to save his life plaintiff jumped from said locomotive engine upon which he was riding and in jumping therefrom plaintiff struck a stump standing close beside

the said track, which caused his said leg to be thrown back on the track, and by reason thereof it was mashed by the said locomotive engine; and by reason thereof the muscles and bones of the plaintiff's said leg were so mashed, torn, and lacerated that it became necessary to amputate plaintiff's said leg; and the plaintiff was thereby permanently injured, and was so greatly bruised, broken and damaged in his body and limbs that he became and was thereby made sick, sore and lame and disordered, and so remained for a long space of time, to-wit; for four months; that the same will and does permanently affect and impair the health, strength and activities of the plaintiff, and that the plaintiff since the said accident has continuously suffered great pain of body and anguish of mind, and by reason of said accident plaintiff was compelled to employ the services of physicians, and was forced to expend large and divers sums of money in payment of the services of said physicians, nurse hire, and for medicine; that at the time of the said accident the plaintiff was forty-one years of age, and was earning $2.25 per day; and that by reason of said accident the said plaintiff is not able or in a condition to earn a livelihood; wherefore plaintiff claims he has sustained damages to the amount of fifteen thousand dollars."

The second count of the declaration contains the allegations of the first count, except that the negligence of the defendant is particularized as follows: "that the said track and rails were wet, and the said locomotive engine and tender leaked in such a way the water therefrom fell upon the rails of said track, and the sand box on said locomotive engine was in such a defective condition that sand would not fall therefrom upon the rails of said track

by reason whereof the said locomotive engine upon which plaintiff was riding could not be stopped and collided with the said derailed locomotive engine."

To this declaration the defendant interposed a demurrer, setting forth certain substantial matters of law to be argued in support of the same separately as to each count. This demurrer was overruled, whereupon the defendant filed the following pleas:

"And now comes the defendant in the above entitled cause by its attorney and for pleas to the amended first and second counts of the declaration says:

First. That it is not guilty in manner and form as in said counts is alleged.

Second. That if the plaintiff was injured in the manner complained of in said amended first and second counts, the injury was caused by the neglect or default of a fellow servant of the said plaintiff, for which this defendant is not legally responsible.

Third. That if the plaintiff were injured in the respect complained of by him, it was due to his own negligence in recklessly jumping from the locomotive and unnecessarily subjecting himself to danger of injury.

Fourth. That the plaintiff was not injured through any negligence on the part of the defendant, but was injured solely through jumping from a moving locomotive and it was not necessary for said plaintiff to expose himself to the danger of injury from jumping from said locomotive as is alleged in said counts of said declaration.

Fifth. That the plaintiff voluntarily entered upon the service mentioned in the declaration and in so doing had full knowledge of the surroundings and the dangers thereof, and thereby assumed all risk of injury incident thereto."

The cause was submitted to a jury upon the issues joined, with the result that a verdict was rendered in favor of the plaintiff for the sum of $2,000.00, upon which judgment was entered and which judgment the defendant has brought here for review and has assigned numerous errors. We shall consider only such assignments as we deem necessary for a proper disposition of the case.

The evidence establishes that the defendant was engaged in the operation of a sawmill and as an incident to such business owned and operated a steam railroad about six or seven miles long, commonly known as a log road. This being true, it necessarily follows under the decisions of this court that the defendant is not a railroad comany within the terms and meaning of Sections 3148, 3149 and 3150 of the General Statutes of 1906. See Taylor v. Prairie Pebble Phosphate Co., 61 Fla. 455, 54 South. Rep. 904, and Stearns & Culver Lumber Co. v. Fowler, 58 Fla. 362, 50 South. Rep. 680. The right of the plaintiff to recover in the instant case must be based upon the common law liability of the defendant. As we have several times held, the common law is in force in this State, except where it has been modified by competent governmental authority. See Co-operative Sanitary Baking Company v. Shields, decided here at the present term, and prior decisions therein cited. We also held in this cited case, following numerous prior decisions of this court, that, in actions for the recovery of damages to a person or his property, alleged to have been occasioned by the negligence of the defendant, the common law principle which prevents a recovery if the plaintiff's own negligence contributed proximately to his injuries has not been modified or changed, except

as modified by sections 3148, 3149, 3150 Gen. Stats. of 1906, and Chapter 6521 Acts of 1913.

Another principle of the common law which we have had occasion frequently to announce ·is that where the master himself has performed his duty, he is not liable to one of his servants for personal injuries recived by such ,servant in the course of his employment, through the negligence of a fellow-servant or co-employee of such servant, when engaged in the same undertaking or common work or enterprise, unless such fellow-servant or co-employee sustains a representative relation, such as vice-principal, to the master.    See Coronet Phosphate Co. v. Jackson, 65 Fla. 170, 61 South. Rep. 318; Stearns & Culver Lumber Co. v. Fowler, *supra;* Prairie Pebble Phosphate Co. v. Taylor, 64 Fla. 403, 60 South. Rep. 114; Camp v. Hall, 39 Fla. 535, 22 South. Rep. 792. We held in these cited cases, as well as in others both prior and subsequent, that this common law principle was in force in this State, except as modified by the statutes above cited.    As we said in Co-operative Sanitary Baking Co. v. Shields, decided here at the present term, if this common law principle is to be still further modified, it must be done by the legislature, as it is beyond the power and province of the courts.

We are clear that the first count of the declaration is not open to attack by demurrer.    As we have frequently held, "In actions for negligent injuries it may be necessary to allege only the relations between the parties out of which the duty to avoid negligence arises, and the act or omission that proximately caused the injury, coupled with a statement that such act or omission was negligently done or omitted."    See Co-operative Sanitary Baking Co. v. Shields, *supra,* and authorities there cited.    As we

have also often held, "A declaration should contain sufficient allegations of all the facts that are necessary to state a cause of action. As a general rule, only ultimate facts need be alleged." Neither do we think that the second count was demurrable. See Seaboard Air Line Railway v. Rentz, 60 Fla. 429, 54 South. Rep. 13; Aultman v. Atlantic Coast Line R. R. Co., decided here at the present term; Logan Coal & Supply Co. v. Hasty, 68 Fla. 539, 67 South. Rep. 72.

We now direct our attention to the testimony adduced. The plaintiff testified in his own behalf as follows: "My name is J. A. Geiger. I was employed in the month of September, 1910, by the Ingram-Dekle Lumber Company and on the 16th day of September, 1910, I didn't have anything to do with the operation of their locomotives or log trains. I was directed by Mr. Kendrick, the superintendent, to proceed to where another locomotive was derailed and assist in putting it on the track. At the time I was working out on the road keeping up track and building track. I was a laborer and foreman of the gang. Mr. Rivenbark was engineer of the engine on which I rode and I had nothing to do with the operation of it. I had no authority over Mr. Rivenbark or the fireman. I went out that morning to take up the wreck and we started down the hill and the engine got away from the engineer and some way got faster and faster and when we got in about forty yards, something like that, he threw himself around right quick and says, 'Boys, I have done everything I can do.' I was sitting on the fireman's seat and the negroes all swarmed to the door and I couldn't get out. There were about sixteen or seventeen of us on there, and when I jumped I didn't know anything until it was all over. The engineer

jumped before I did. When I came to, I found my right foot was gone. Before we got to the hill the engine was not running so very fast, the engineer turned down as he generally run it. I saw they put on brakes and tried to stop the engine after it struck that hill and the brakes didn't have a bit of effect on the speed of the engine and when the engineer turned and says, 'Boys, I have done everything I can,' and jumped off, I jumped too. In falling or jumping off the engine I don't know if my foot or leg struck a stump, I don't know anything about it after I hit the ground. When I made my jump there was a clear place there and right over yonder a piece there was a stump and when I hit the ground I didn't know anything more for a few minutes and when I came to my foot was lying back to the track and these four teeth (indicating) was knocked out and my head busted around the skin here about three inches and I was lying around the stump. After I was injured I was taken to the mill and was carried to the house and my leg dressed. The company paid the doctor's bill. I make no claim against the company for doctor's bills. I was forty-one years old at the time I was injured and was earning two dollars and twenty-five cents a day. The company paid for my medicine and nursing and paid my wages for a month and a half and have paid me nothing since that time. I was in bed forty-one or forty-two days and was incapacitated from work five or six months and they allowed my wages for a month and a half. I have suffered pain from the injury practically all the time since I was hurt and am now wearing an artificial wood limb and haven't been able to earn what I usually earned since. I am not able to work as I did before."

On cross-examination, the witness testified: "I had

been in the employ of the defendant company from January first to September sixteenth, a little over nine months up to the time I was hurt. I was employed building and keeping up the road—the track. I built and actually superintended the building of this particular track on which the accident occurred and had a gang of men working under me and directed them in laying the cross-ties and rails and putting it in shape for the trains to run over it, and after that was daily engaged in inspecting the track and keeping it in order.

And thereupon the following question was propounded to the witness, to which he gave answer: Q. And in the course of that employment you made use of the trains, the track, cars and engines that ran up and down the road, didn't you, in moving about you rode on the engines and on the cars up and down that road? A. I went down on the engine every morning and in at night. Q. And when you wanted to go from one place to another and the train happened to be passing by, you got on and rode didn't you? A. Yes, sir. I was looking after the track and Mr. Rivenbark and Smith were looking after the running of the locomotives. The train crew attended to the cars and coupling the same and the men attended to cutting down trees and sawing up the logs and loading them on the cars; that is, the common laborers did, and I rode up, and down on that train from time to time. Except for a few days I rode on that particular locomotive that Mr. Rivenbark was running previous to the time I was hurt every day night and morning. It carried us out every morning and brought us in at night and I generally rode in the cabin with the engineer. I saw how he operated it. I hadn't had enough experience to run the locomotive over those hills, I didn't know how to operate the levers but had rid-

den on that locomotive on the hill where the accident oc-
curred.   I know the hill where the accident occurred.   I
had been riding on the engine every night and morning
and had gone over the road on the same locomotive very
recently before I was hurt."

The witness testified to some further matters on his
cross-examination, but this portion of his testimony is
not material here.   The plaintiff was also recalled in re-
buttal in his own behalf and was examined and cross-
examined, from which we copy the following portion:

"On cross examination the witness testified as fol-
lows:  Q.  Mr. Geiger, you say Mr. Kendrick gave you
permission to go up and down on the locomotives after
you told him the men complained about killing too much
time with the lever car?  A.  Mr. Ingram; that was Mr.
Ingram.  Q.  You told him and he said well, you can go
up and down on the locomotive?  A.  No, the men was
kicking about going out and coming in on their own time
and I told Mr. Ingram about it, and he said the engine
is going out every morning and comes in every night,
go on it.  Q.  It was up to you to do as you pleased
about it?  A.  He told me to go on the engine.  Q.  And
from that time you were accustomed to going on the
engine?  A.  Yes, sir.  Q.  The night before when you
and the crew went down to the scene on that engine
didn't you take your jacks and blocks down there with
you that night?  A.  No, sir.  Q.  Didn't take anything
with you?  A.  No, sir.  Q.  You did go down there?
A.  Yes, sir.  Q.  Went down on engine forty-two?  A.
Yes, sir.

On re-direct examination the witness testified:  Q.
Did the superintendent know you were going on forty-
two?  A.  Yes, sir.

On re-cross examination the witness testified:  Q.

How do you know he knew it?' A. I told him I was going. Q. Did you tell him you were going on forty-two? A. Yes, sir."

J. T. Rivenbark was the first witness introduced by the plaintiff in his behalf and his testimony on the direct and cross-examination covers nearly twenty typewritten pages. Among other things, he testified that he was the engineer in charge of the engine on the morning that the plaintiff was injured and had the sole charge of it, that a boy was firing for him, an engineer and fireman comprising the crew of an engine for its operation, that he had been a log train engineer for three or four years and had been working for the defendant, operating such engine for about six months prior to the accident, "operating it daily, almost every day, running about fifty or seventy-five miles a day." The witness also testified: "There were some little things the matter with the engine. The air-pump was not working at that time. The engine had an air-pump, but it was not working. It had been out of order about a month and a half. I used the reverse lever to stop the engine. I had to reverse the engine and put on steam to stop it and could also use the hand-brakes on the tender. Some of the woodwork under the tender was a little bit faulty and had settled down on the brake-beam lever; that is, a part of the truck frame under the tender was faulty and bore down on the reach-irons that went between. The reach-irons were rods that went from the dead lever and from there to a chain and then around a rod that wound up and tightened. It was a part of the brake attachment. This kept the hand-brake from being as effective as it had been before. On that account the locomotive would not be as easily controlled. One brass on the locomotive had burst I believe and there were some small leaks in the

boiler that didn't amount to much.  I am not sure wheth-
er the engine was leaking at the time we started out with
Mr. Geiger that morning.  We had a collision with the
derailed engine, but I couldn't say whether the boiler
was leaking at that time or not.  I don't know if the
boiler was leaking the night before.  It had been leak-
ing at different times.  It had had some small leaks pre-
vious and we sometimes would take a small cork or two
—but it hadn't been mended and I don't remember ex-
actly, but it was probably a few days or a week before
the accident since I had noticed any leaks and the boiler
hadn't, in the meantime, been repaired."

On motion of the defendant, the court struck out that
portion of the testimony of the witness with reference to
leaks in the boiler because the witness had testified that
he did not know whether it was leaking on the day of
the accident, and instructed the jury to pay no attention
to the testimony of the witness as to any leakage in the
boiler or engine.

We also copy the following proceedings from the
examination of such witness:

"And the witness further testified that at the time
he started out with the engine on the morning of the ac-
cident he was running it backwards because there was
no way of turning it around, provided by the defendant.

Said witness further testified that there had been
some trouble about one of the brake-shoes knocking off
the locomotive at times, but didn't remember whether all
the shoes were on the locomotive on the morning of the
accident or not.

And thereupon questions were propounded to the wit-
ness and answers given to them as follows:  Q.  Now,
how did you run the engine that day, did you run it in
going down there, did you run it as slow as you gener-

ally ran it? A. Yes, sir. Q. Do you recall seeing the locomotive that was derailed before you got there, before you got to it? A. Yes, sir. Q. Now, on getting close to the place where you knew the locomotive that was derailed was lying, what did you do? A. I jumped off. Q. Didn't you do anything before you jumped off? A. I told the other fellows I had done all I could. Q. What did you mean that had done? A. Tried my best to stop it. Q. Oh! You tried to stop it; tried to stop the engine did you when you got near where you knew the engine was. Wouldn't the engine stop? A. No, sir. Q. Why wouldn't it stop? A. Because couldn't hold it. Q. Why couldn't you hold it? A. The reversing of the engine, what brake we put on it wasn't sufficient to stop it. Q. The reversing of the engine with the brake you put on it wasn't sufficient, that is what you say? A. Yes, sir. Q. Didn't you do everything that was possible to stop it with the means at your hand? A. Yes, sir. Q. When the brakes were put on this tender, state whether they held or had any effect upon the speed of the engine? A. They didn't seem to thave any effect on it. Q. Now, why did you jump? A. Because I was almost certain there would be a collision. Q. What did you expect would be the result if you stayed in that engine in case of a collision? A. Would be likely to be smashed up and killed. Q. When you turned to the people on the engine and says, 'Boys, I have done all I can' was Mr. Geiger then on the engine? A. Yes, sir. Q. You didn't jump until after you had said that? A. No, sir."

The witness further testified: "The engine I was on collided with the derailed engine. I had reported some of the defects in the engine to the superintendent or foreman; I don't know when exactly. I was in the

habit of making reports like that at different times all along.  I had noticed one of the brake-shoes gone before that day, but I don't remember whether we had fixed it or not.  It had run some little time without one and I don't know whether we fixed it at that time or not.  I made no examination on that morning to see if the brake-shoe had been put on.  The sand-box wasn't in working order, and we never did keep any specially prepared sand for it.  The engine wasn't equipped with sand and the sand-box wasn't working that day.  It had been like that all the time I had been there.  When the engine or boiler or brakes got out of order I did any small repairs myself, such as putting in a shoe on the brake.

And thereupon the plaintiff propounded to the said witness the following question:  Q.  Did the brakes work any better that day going out, the 16th, than usual?  To which question the witness answered:  Ans. No, sir.

And thereupon the plaintiff propounded to the said witness the following question:  Q.  And they were in the same condition, that is, they worked no better on that morning than they had been working before; that is what you started to say wasn't it?  To which question the witness answered, Ans. Yes, sir.

And the said witness further testified:  It was not my duty to fix the decayed timbers underneath the tender.  The company didn't have any special man, they usually got some mechanic or blacksmith or some man who could do the work."

On cross-examination, the witness testified:  "I went out on the road on the morning of the accident in charge of the locomotive as engineer.  I was familiar with the track it had to run over, knew the curves, hills and hollows.  I knew it was early in the morning, but didn't

know there was any dew on the rails but knew there was dew at times."

The witness further proceeded to testify on cross-examination: "I didn't jump before we got over the crest of the hill. I stayed on the locomotive until just a little bit after we passed the summit of the last little knoll, maybe about the center of it. I don't remember whether all the men jumped off or not. I know some of them did. Mr. Geiger was the only one seriously hurt except a darky who was knocked unconscious for a day. I don't know what the percentage of the grade was, but it was a pretty sharp descent. Mr. Geiger, the plaintiff, had been employed there for some time. I had known him two or three years. He had been employed there all the time; I had been there about six months. He was there when I came. He was track foreman. He was in charge of keeping up this track that we were running over that morning. He was superintendent or foreman of the men who looked after the track. He was accustomed to riding up and down on that train which I operated in and about performing his duties. He got on the locomotive from time to time and rode down with me. He did so frequently. He rode with me almost every day on the locomotive. That is the same locomotive we were operating the morning he was hurt. The air-pump was not working and hadn't been depended on much since I had been there. I had been operating that locomotive with a train of cars attached to it by the hand-brake on it and the steam-brake, that is, the reversal of the throttle. I didn't depend on the air-pump.

And thereupon the following question was propounded to the witness: Q. Did you tell Mr. Kendrick about that brake, make complaint to him that it was out of order? To which the witness answered as follows: Ans.

I don't remember telling him anything about it.  Q. You didn't think it was of any importance, did you?  You didn't depend on it at all, did you?  A.  I didn't think it was much because when it did run it was of so little effect.  Q.  When the pump was working the air, you put on the hand-brake just the same and reversed the lever?  A.  Yes, sir, the hills were so long the air would give out before you got down and you had to fall back on this.  Q.  How many of these log roads in this territory have you ever worked on that had locomotives equipped with air-brakes?  A. About two of them, I reckon.  Q. About two.  Didn't any of the companies have all of them equipped that way?  A.  Might have one or two locomotives equipped with air-brakes, but most of them they used the throttle and hand-brakes.  Q.  You think it had been out of order for a month or more, and you said you didn't report that to Mr. Kendrick?  A.  I don't remember whether I did or not.  Q.  Now, you said some of the woodwork under the tender had settled down on the brake beams and bore down on the reaches connecting with the brake attachment.  How long had the woodwork been in that condition?  A.  It had been gradually settling down for a month or so, I guess.  Q.  Gradually settling down for a month or so?  A.  Gradually rotting.  Q.  Gradually rotting or wearing away by the friction, which?  A.  It was rotting.  Q.  Did you report that to Mr. Kendrick?  A.  I don't know whether I did it or not.  Q.  You didn't consider it serious enough to make the locomotive dangerous did you?  A.  I don't remember whether I considered much about it or not.  Q.  You were willing to risk yourself on it weren't you, and did so from day to day?  A.  Yes, sir.  Q.  Now you said that one brass was burst.  Was that one of the brasses inside of the hub where the axle runs into the hub, you

mean that? A. No, it was in one of the main brasses on the crank-pin. Q. On the crank-pin. Now what connection did that have with the brake system on the locomotive? It didn't have anything to do with the brakes; didn't have anything to do with stopping and starting the engine, so far as applying the brakes was concerned did it? A. No, sir. Q. And you say that the lime sediment in the water from time to time stopped up any little leaks so that they were not regular, it would drop water at times and sometimes be closed up? A. Yes, sir. Q. And you don't remember whether the brake-shoes had all been put on the tender at the time or not, do you? A. No, sir. Q. And you ran it that morning just the same as you had been accustomed to running it every other time you went out on the track with it? A. Yes, sir. Q. And when you got to that hill and started down the hill and found you couldn't stop it, you told the others that you had done everything you could and to look out for themselves, is that what you said to them? A. Yes, sir, that was about what I said. Q. And you had reversed the engine at that time. Now when you reversed the throttle that reversed the wheels and stopped them didn't it? That is, they reversed the other way? A. They generally spun around the other way. Q. And you did all you could to stop it? A. Yes, sir. Q. And you say the brakes didn't seem to have any effect. Now, Mr. Rivenbark, isn't it a fact that you started out that morning with that locomotive and you had these men on the engine with you and that you were going at a pretty good rate of speed and when you got to the crest of the hill the track was wet with dew and the grade was steep and you found you couldn't control it on account of the steepness of the grade and the wet track, isn't it a fact, and isn't that the reason the engine went

down hill instead of because you didn't have all those brake appliances to put on it? A. I didn't think it would be any trouble to control it, just the engine without any cars, because I had been going down there with cars behind it. Q. How is that? A. I was in the habit of going down there with empty cars on behind it, and I didn't think it would be any trouble because it was just the light engine and no cars behind it, and it naturally wouldn't pull down as fast as it would— Q. You thought it would do just as well as it usually did, didn't you? Then it ran that morning just as well as it usually did, didn't it? A. It run faster than it usually did. Q. You put more steam on it, didn't you? A. No, sir, I didn't put steam on it then only in trying to stop it. Q. You were running it faster that morning than you usually ran it, didn't you? A. No, sir, but it ran faster; that is, it ran faster when it started down the grade. Q. I see. Then you didn't take into consideration the effect of going down that grade with an empty engine or an engine without any cars attached to it would have on being able to stop it, is that it? A. (No answer.) Q. Is that the reason it got away from you? A. The reason it got away, all I could see, was the dew on the track and the grade, the steep grade and the insufficiency of the brakes. Q. All three of them went into it? A. Yes, sir. Q. Because the brakes wouldn't hold and because the track was wet and because the grade was steep? A. Yes, sir. Q. How long was that hill from the crest of the hill to where the other locomotive was derailed, how far was it? A. It was nearly a half mile, I guess. Q. Nearly half a mile. Was it a steady down grade? A. About two-thirds of it was. It was a steady down grade and then there was a little rise over a little knoll and then down again. Q. And the last knoll, it was passed the

last knoll when you jumped? A. About the top of the last one. Q. About the top of the last one? A. Yes, sir. Q. About how far was it from the top of the last knoll to where this locomotive was derailed? A. About thirty or forty yards. Q. And you jumped at about thirty or forty yards from where the two locomotives came together? A. Yes, sir.

Said witness further testified. "I reversed the steam at the top of the big hill just like I had been doing every day; as I had been operating it every day and I didn't get the results that I usually did. The sand-box was on the boiler ahead of the steam pump in front. That is the usual place for a sand-box on a locomotive, and, if there had been sand in the sand-box that morning, it wouldn't have helped any because we were running backwards. I talked with several people about this wreck at the time it happened—Mr. Geiger, Mr. Smith and Mr. Kendrick, and different people. I haven't said anything to Mr. Hendley recently but I have talked with Mr. Hampton today and with Mr. Geiger today and yesterday. It had been two years before that time since I had seen Mr. Geiger. I have had three or four letters from him in the meantime. My recollection is pretty clear now of all the things I have testified to. I don't remember the details in the same way now as I did the day after the accident; I was more shocked then, but I knew what had happened and had been working on the locomotive for six or eight months every day and knew the condition of the locomotive pretty well. I couldn't say that my mind was clear right then; I couldn't testify as to the clearness of my mind then."

J. Arthur Smith was also introduced as a witness on behalf of the plaintiff and testified as follows: "My name is J. Arthur Smith. I remember the engine on

which Mr. Geiger was injured, on the 16th of September, 1910. I don't remember if the engine was leaking before we started out or not."

This same witness was also called on behalf of the defendant and testified as follows: "My name is J. A. Smith. I was employed by Ingram-Dekle Lumber Company at the time Mr. Geiger's foot was cut off and was on the train that morning. I was on the train at the time it went over the crest of the hill. The train came pretty near to a stop at the crest of the hill, after it came up on the top of the hill. As soon as it turned down grade the further it went the faster it got, after it turned over—down the hill. I stayed on the locomotive until it hit the other engine. I was not hurt enough to amount to anything, just scratched a little. I didn't jump."

On cross examination the witness testified as follows: "I was on the locomotive that morning."

And thereupon the plaintiff propounded to the said witness the following question, which was answered: Q. "Mr. McKay has asked you if you stayed on the engine and you said you did. I ask you what impressed that fact upon you, why is it that you remember now that you stayed on the engine? A. Why, I stayed on the engine for the purpose of stopping it until I found that it was running too fast to get off without getting hurt, and I rather risk staying on it and hitting the other one than to risk jumping off."

W. H. Kendrick was introduced as a witness by the defendant and testified that he was the superintendent of the defendant company at the time the plaintiff was injured and proceeded to testify as follows: "I know Mr. Rivenbark. He was engineer on that locomotive. From the time I went on duty as superintendent of the mill until Mr. Geiger was hurt he never reported to me

that engine number forty-two was out of repair or in a defective condition in any respect. He was on it daily. He never applied to me for any repairs to be made on it that I recall. If anything serious had been the matter with it, it would have come to my attention, and I would have given orders to have it repaired. I know I didn't give any orders for its repair. I remember when engine number forty-three got off the track beyond the hill the night before Mr. Geiger was hurt. I learned it had been derailed after the log train came in that night. They came in on the log train. It was about a quarter or a half mile from the switch where the log road was operating at that time to where the wreck was, and they came in on the log train that night and was talking about it. Smith reported to me first. Smith was running the engine. Mr. Geiger saw me that night at supper time. It was part of his duties as a track foreman to clear the track of wrecks and to help to put locomotives and cars that might get off the track back on. He did that right along. These things happen frequently on log roads."

This witness also gave the following testimony: "Q. What was the condition of that track at the place of the wreck with reference to the grade? A. Well, sir, it was a tremendous grade, something that there is not but very few grades in Florida any worse than it was; it was right over a tremendous steep hill. Q. Mr. Geiger built that piece of track, didn't he? A. I suppose he did. Q. You were not there when that was done? A. No, sir, I wasn't. Q. His duties carried him over it from day to day didn't it? A. Yes, sir. Q. He knew the condition of it and the slope of the grade? A. He knew the track all right, yes, and knew the condition of it. Q. Mr. Kendrick, I wish you would state whether or not a locomotive on that grade with that track being wet with

dew or slippery with water, could have been stopped by
the ordinary application of brakes?    A.    I would hate
to say whether it could be done or not, but I would hate
awfully bad to try it.    Now, the fact of the business is
that it was a tremendous grade and with a wet track, I
believe it would have slid down there from the top of
the hill to the bottom without—if it had been locked
without there had been sand or something on the track to
have prohibited.    Q.    You were familiar with the road
when the accident occurred, wasn't you?    A.    Yes, sir.
Q.    And you tell these gentlemen that that was a very
high hill, a bad hill, was it?    A.    Yes, sir.    Q.    And
from your knowledge of engines and engine forty-two,
you believe that brakes  or nothing else would  have
stopped her that morning; that she would have gone right
on down that grade?    A.    I certainly do.

And thereupon the said plaintiff propounded to the
said witness the following questions:    Q.    How could
that grade have been obviated?

But to the question as propounded, defendant did
then and there object on the ground that the same was
immaterial and irrelevant.

But the said Judge did then and there overrule the
said objection and permit the said witness to answer the
question as follows:    Ans.    By cutting the hill down.
To which ruling defendant did then and there except.    Q.
That is the way it is done, isn't it?    A.    That is the way
all railroads are built."

Ernest Tomax was also introduced as a witness by
the defendant and testified: "My name is Ernest Tomax.
I live at Dade City.    I was at the Ingram-Dekle Com-
pany mill right north of Dade City in September, 1910,
at the time Mr. Geiger's foot was cut off in an accident.
Was there the night before.    I know engine forty-two

that was used at the time. That engine went down the night before to the scene of where engine number forty-three was off the track. It went down and came back without accident. I went along. Mr. Geiger went along. It was about seven-thirty o'clock when we went down and about nine, as I remember it, when we came back; it went down and came up all right the night before. I don't know if Mr. Kendrick, the superintendent, knew Mr. Geiger was going down on the engine. He was in charge of everything at the mill. I don't know if he saw the parties actually getting on the engine."

We are of the opinion under the decisions of this court that the plaintiff and the engineer, Rivenbark, were fellow-servants. See especially Parrish v. Pensacola & Atlantic R. R. Co., 28 Fla. 251, 9 South. Rep. 696, wherein we held as follows:

"Prior to the enactment of Chapter 3744, Laws of 1887, a master was not liable or responsible to one servant for personal injuries received in the course of his employment through the negligence of a fellow-servant, when engaged in a common work or in the same general undertaking.

The engineer, fireman, brakeman and shovelers on a gravel train engaged in loading, hauling and unloading gravel in repair of the road-bed are fellow servants engaged in the same common work, and the employer company, prior to the passage of said statute, was not liable to one of such shovelers for personal injuries received in consequence of the negligence of the engineer in putting the handling of his engine in the hands of his fireman who was either careless or unskilled in the management of such machines."

Also see the authorities cited in the opinion, especially Gillshannan v. Stony Brook R. R. Co., 10 Cush. (Mass.)

228; Ohio & Mississippi R. R. Co. v. Tindall, 13 Ind 366; St. Louis & S. E. Ry. Co. v. Britz, 72 Ill. 256. We would also refer to Norfolk & Western R. R. Co. v. Nuckols, 91 Va. 193, 21 S. E. Rep. 342, wherein it was held: "A track repairer and engineman, though in different departments, are, by the very nature of their employment, brought into frequent contact, and the risk of negligence by the one must therefore be considered to have been in contemplation of the other when service under the common master was accepted."

This would seem to be well in point. Also see Sanderson v. Panther Lumber Co., 50 West Va. 42, 40 S. E. Rep. 368, 55 L. R. A. 908, 88 Am. St. Rep. 841, and White v. Kennon, 83 Ga. 343, 9 S. E. Rep. 1082. Other illustrative cases will be found in 4 Labatt's Master & Servant (2nd ed.), Chapter LX, especially pages 4080-81. We would also again refer to Stearns & Culver Lumber Co. v. Fowler, 58 Fla. 362, 50 South. Rep. 680.

At the request of the plaintiff, the trial court gave the following instruction to the jury:

"The defendant has filed a second plea in which it sets up as a defense that the injury to the plaintiff, if caused as alleged, was due to the acts and negligence of a fellow servant, and I charge you that, in order to be a defense, you must find that the plaintiff, and the engineer, or person in charge of said locomotive on which the plaintiff was injured, were connected in the same common employment. If you find from the evidence that the work which the plaintiff was employed to do had no relation or connection with the operation or equipment of said locomotive, and that at the same time and place the plaintiff had no control or voice in the operation of the same, I charge you that, under such circumstances, they cannot be regarded as fellow servants."

In the light of the decision which we have just cited, we are of the opinion that this instruction was erroneous and that the assignment based thereon must be held to have been sustained. We do not think the testimony establishes that Rivenbark, the engineer, sustained a representative relation, such as vice-principal, to the defendant. It necessarily follows from what we have said that the plaintiff and the engineer being fellow-servants, if the testimony establishes that the proximate cause of the injury to the plaintiff was the negligence of such fellow-servant, the plaintiff cannot recover. In South Florida R. R. Co. v. Weese, 32 Fla. 212, 13 South. Rep. 436, we refused to adopt what has been called "the separate department distinction" and have adhered to this holding. See Stearns & Culver Lumber Co. v. Fowler, *supra,* and prior decisions of this court there cited. It may well be doubted, to state it mildly, if the testimony establishes that the negligence of the engineer was the proximate cause of the injury to the plaintiff. We shall not undertake an analysis or discussion of the testimony, the portions of which bearing upon the cause of the injury inflicted upon the plaintiff we have set forth above, but we are of the opinion that it does not sustain the allegation of the plaintiff in the first count of the declaration, "that the said defendant through its agents and employes in charge of the operation of said locomotive engine upon which the plaintiff was then riding so negligently operated the same that it collided with the said derailed locomotive engine," as a consequence of which negligence the plaintiff was injured, therefore there could be no recovery under the first count.

We will add that we do not think the testimony shows contributory negligence upon the part of the plaintiff, as we are of the opinion that he was warranted in

jumping from the engine under the existing circumstances.

We are further of the opinion that the testimony fails to establish the allegation in the second count of the declaration as to the cause of the injury, which we have copied above. It may be true that the track and rails were shown to be wet, but that would seem to have been caused by the dew and not by leakage from the engine and tender, as no proof was adduced that they were leaking on the morning that the injury occurred. The testimony further establishes that the sand box on the engine was in a defective condition and was not in working order and was not working that day, but the testimony further shows that no "specially prepared sand" was ever kept for such sand box and that the engine was not equipped with sand. Rivenbark, the engineer, the plaintiff's witness, testified that it had been like that all the time he had been there as such engineer, a period of about six months, and that "if there had been sand in the sand box that morning, it wouldn't have helped any because we were running backwards," having previously testified that he was running the engine backwards because there was no way of turning it around provided by defendant. Even if the absence of sand had been the proximate cause of the injury, which was not shown, the plaintiff might well have been held to have assumed such risk, since such a condition had existed about six months and the plaintiff had been riding on the engine almost daily. As no place had been provided by the defendant to turn the engine around and in consequence it had to be run backward and the sand box could not be used, the plaintiff might well have been held to have assumed that risk. The witness, Rivenbark, further testified that the reason the engine got away from him was "the dew on

the track and the grade, the steep grade and the insufficiency of the brakes," but none of these things were alleged in the declaration as the cause of the injury.   It is a well settled principle of law, which we have announced time and again, that the *allegata* and *probata* must meet and correspond, the issues being made by the pleadings to which the proof must be confined.   See Atlantic Coast Line R. Co. v. Crosby, 53 Fla. 400, 43 South. Rep. 318, and Rentz v. Live Oak Bank, 61 Fla. 403, text 414, 55 South. Rep. 856, where other decisions will be found. As we have also frequently held, "There can be no recovery upon a cause of action, however meritorious it may be, or however satisfactorily proven, that is in substance variant from that which is pleaded by the plaintiff."   See Parrish v. Pensacola & Atlantic R. Co., 28 · Fla. 251, 9 South. Rep. 696; Jacksonville, T. & K. W. Ry. Co. v. Galvin, 29 Fla. 636, 11 South. Rep. 231; Walsh v. Western Ry. Co., 34 Fla. 1, 15 South. Rep. 686; Wilkinson v. Pensacola & A. R. Co., 35 Fla. 82, 17 South. Rep. 71; Louisville & N. R. Co. v. Guyton, 47 Fla. 188, 36 South. Rep. 84; Pensacola Electric Terminal R. Co. v. Haussman, 51 Fla. 286, 40 South. Rep. 196; Dexter & Connor v. Seaboard Air Line Ry., 55 Fla. 292, 45 South. Rep. 887; Coons v. Pritchard, 69 Fla. 362, 68 South. Rep. 225, L. R. A. (N. S.) 1915 F. 558.

There would seem to be no occasion for further discussion.   The judgment must be reversed.

TAYLOR, C. J., and COCKRELL, WHITFIELD and ELLIS, JJ., concur.