TAMPA ELECTRIC COMPANY, a Corporation, *Plaintiff in Error,* v. R. C. BOURQUARDEZ, as Administrator, *Defendant in Error.*

## Opinion Filed Aug. 8, 1916.

1. In actions for negligent injuries it may be necessary to allege only the relation between the parties out of which the duty to avoid negligence arises, and the act or omission that proximately caused the injury, coupled with a statement that such act or omission was negligently done or omitted.

2. In an action against an electric railway company whereby it is sought to recover damages for the death of a person who is alleged to have been killed by reason of the negligent and careless operation of a car of such company, where the evidence adduced affirmatively shows that the deceased failed to exercise that degree of caution and prudence which the known risks required, but so negligently rode a motorcycle upon the car track as to bring about a collision between his motorcycle and the approaching car as to occasion his death, the speed of the car cannot be considered the proximate cause of the fatal injury, and there can be no recovery under the provisions of Section 3149 of the General Statutes of 1906, the deceased having come to his death through his own negligence.

Writ of Error to Circuit Court, Hillsborough County; F. M. Robles, Judge.

Judgment reversed, COCKRELL, J., dissenting.

*P. O. Knight,* for Plaintiff in Error;

*H. S. Hampton,* for Defendant in Error.

SHACKLEFORD, J.—R. C. Bourquardez, as administrator of the estate of D. B. Bourquardez, deceased, insti-

tuted an action at law against the Tampa Electric Company, a corporation, owning and operating a line of electric railway in Hillsborough County, whereby he sought to recover damages in the sum of $25,000.00 for the death of D. B. Bourquardez, a son of R. C. Bourquardez, approximately twenty-one years of age, whose death was alleged to have been occasioned by the negligence of the defendant. The declaration consists of three counts, the first of which alleges that "a car of the defendant at said time and place was so negligently and carelessly operated and propelled that the same was negligently and carelessly permitted to come into violent collision with the body of the said D. B. Bourquardez, by means whereof he was then and there killed;" the second count alleges that, as the deceased approached a certain described crossing on the line of the defendant, riding upon a motorcycle, "a car of the defendant was negligently and carelessly permitted to approach said crossing at a dangerous rate of speed, so that by means of the said negligent and careless operation of said car at said time and place the said Bourquardez was run into by said car on or near said crossing, and by means of said collision was then and there killed;" while the third count alleges that "a car of the defendant was negligently and carelessly permitted to approach said crossing without warning or other signal so that by means thereof said car was carelessly and negligently permitted to come into violent collision with the body of the said D. B. Bourquardez, by means whereof he was then and there killed." The defendant unsuccessfully interposed a demurrer to the declaration and the several counts thereof and then filed pleas of not guilty and contributory negligence, upon which issue was joined and the case came on for trial before a jury, which resulted in a verdict and judgment in favor of the plaintiff

for the sum of $800.00, which judgment the defendant has brought here for review.

We shall discuss only such of the nineteen errors assigned as, we think, require it for a proper disposition of the case.    The first assignment is based upon the over-ruling of the demurrer to the declaration.    As we have said, this demurrer was addressed to the several counts of the declaration, and set forth numerous grounds or matters of law intended to be argued in support thereof. In view of the conclusion which we have reached, there seems to be no necessity for any extended discussion of this assignment.    We have frequently had occasion to construe Sections 1441 and 1444 of the General Statutes of 1906, Compiled Laws of 1914, relating to demurrers to pleadings in actions at law and the form thereof.    See Co-operative Sanitary Baking Co. v. Shields, 71 Fla. 110, 70 South. Rep. 934, and prior decisions of this court therein cited, especially Warfield v. Hepburn, 62 Fla. 409, 57 South. Rep. 618; Consumers' Electric Light & St. R. Co. v. Pryor, 44 Fla. 354, 32 South. Rep. 797, and Jacksonville Electric Co. v. Schmetzer, 53 Fla. 370, 43 South. Rep. 85.    We would also refer to Ingram-Dekle Lumber Co. v. Geiger, 71 Fla. 390, 71 South. Rep. 552.    As we held in these cited cases, in actions for negligent injuries it may be necessary to allege only the relation between the parties out of which the duty to avoid negligence arises, and the act or omission that proximately caused the injury, coupled with a statement that such act or omission was negligently done or omitted.    The discussion in Morris v. Florida Cent. & P. R. Co., 43 Fla. 10, 29 South. Rep. 541, may also prove serviceable.    Suffice it to say that under the principles enunciated in these cited cases we are of the opinion that this assignment has not been sustained.

We now direct our attention to the assignment based upon the overruling of the motion for a new trial, especially to the grounds thereof which question the sufficiency of the evidence to support the verdict. It is established by the pleadings and evidence that the defendant owned and operated a line of electric railway running from the city of Tampa to a pleasure resort known as Sulphur Springs, which is situated some five miles from Tampa, outside of the corporate limits, and on Sunday afternoon, the 25th day of January, 1914, a car of the defendant, which was filled with passengers going from the city of Tampa to Sulphur Springs, between two and three o'clock, and a motorcycle upon which D. B. Bourquardez, the deceased, was riding collided with each other, which resulted in D. B. Bourquardez being killed. This collision occurred upon or near a point where Gordon avenue crosses the track of the defendant, distant about one-half a mile from Sulphur Springs, the deceased and a companion, W. S. Robles, each riding a motorcycle on Gordon avenue, returning from Sulphur Springs to the city of Tampa. Travel was quite heavy on that day between the two points, as it usually was on Sunday, both on the cars of the defendant and by automobiles and other conveyances, Sulphur Springs being a pleasure resort, as we have said, and special attractions being offered to the public on that particular day. So far the testimony is quite clear and undisputed, but as to the rate of speed at which the car of the defendant was going, as well as to the rate of speed at which the deceased was riding on his motorcycle at the time of the collision the witnesses who testified on behalf of the respective parties differ widely, as is so frequently the case in actions of this nature. The witnesses on behalf of the plaintiff testified that the car was

going at the rate of from twenty to thirty miles an hour, Mrs. Lillie Felts testifying on behalf of the plaintiff that she lived about a block from the crossing on the car track where the accident occurred, had special occasion to observe the car as it approached such crossing at that time, and that "It was going at the regular speed that they run out on that road," which she considered "very fast." The witnesses who testified on behalf of defendant also differed among themselves as to the rate of speed of the car, stating that it was from ten or twelve up to eighteen miles an hour. Nearly all of the witnesses who testified on behalf of the parties litigant were passengers on the car at the time the fatal collision occurred, and testified that they had no interest in the result of the action. W. S. Robles testified on behalf of the plaintiff that he and D. B. Bourquardez, the deceased, were riding on their motorcycles at the time of the accident at a speed of about twenty miles an hour, stating that twenty miles an hour on a good road was not excessive speed for motorcycles, but about the ordinary gait that they run. The only other witness on behalf of the plaintiff who testified as to the speed of the two motorcycles was Mrs. Lillie Felts, who stated that she saw them pass her place, going toward the crossing, and that "they were riding very leisurely, I should think, from what I have seen on motorcycles out that way." Different witnesses who were passengers on the car at the time testified on behalf of the defendant that the two motorcycles ridden by Robles and the deceased were "going pretty fast," variously stating the speed to have been from twenty-five to thirty-five or forty miles an hour. The witnesses testifying for the respective parties also differed as to whether or not the gong was rung as the car was approaching the crossing, several witnesses who were passengers on the car stating

that they did not hear the gong ring, and some of such witnesses stated that the gong did not ring. Mrs. Lillie Felts testified that she was listening "to hear if they rang this little bell, signal bell to stop, and they always answered it with the gong, and they didn't ring the gong." W. S. Robles testified on behalf of the plaintiff that from the time he first saw the car, as he and the deceased were riding toward the crossing, up to the time of the collision he did not hear the car sound any gong. On the other hand, several witnesses who were passengers on the car at the time testified on behalf of the defendant that the gong was sounded as the car approached the crossing, and C. C. Pitman, the motorman in charge of the car, testified that he began to ring the gong "something like one hundred feet, or further than that," prior to the car reaching the crossing. So much for the conflicts in the testimony of the different witnesses as to the respective rates of speed of the car and the motorcycle and as to whether or not the gong of the car was rung as it approached the crossing.

We turn now to other features of the testimony bearing directly upon the accident and which, we think, are decisive of the case. W. A. Greenwald, the first witness introduced by the plaintiff, testified that he was a passenger on the car in question, that on such occasion the defendant was running the car in three sections, making three cars going from Tampa to Sulphur Springs, probably two or three minutes apart, the car upon which witness was a passenger being the second car. There are no conflicts in the testimony as to these points and they may be considered as having been established. Such witness further testified that he saw the two motorcycles approaching the car track, the car being about one hundred feet from the crossing when he first saw the motor-

cycles, the deceased riding on the first motorcycle and
Robles, his companion, coming on his motorcycle behind
him, the motorcycles being at the time when the witness
first observed them about sixty feet from the crossing,
the deceased being about ten or fifteen feet ahead of
Robles; that the two when witness first saw them were
riding along talking, "like anyone would ride along."
The witness further testified that when he saw the de-
ceased for the first time, apparently "he was looking up,"
coming on right toward the car, but giving no appearance
of knowing that the car was approaching; that just be-
fore the motorcycle got to the car, probably within ten
feet of it, the witness saw Robles throw himself off and
the deceased "turning his motorcycle to the side" and the
witness thought "threw himself, too." We take the fol-
lowing excerpt from the testimony of the witness on his
cross-examination: "Q. Could the motorcycles have
seen the car at a distance of sixty feet? A. Looked to
me like they did; yes, sir. Q. Wasn't anything to
intercept the car—the car from the motorcycle sixty feet
from—? A. Intercept them? Q. Intercept the view?
A. No, sir. Q. They could easily see down the street,
and see the car, couldn't they? A. Yes, sir. Q. They
were coming right straight towards the track? A. Yes,
sir; as far as I know they could. Q. Both coming
towards the track? A. Yes, sir. Q. The rear one,
what happened to him? A. He threw himself in the
ditch. Q. He threw himself in the ditch? A. Yes,
sir. Q. And the first one did not? A. He turned
himself, I suppose tried to throw himself, too. Q. Did
you see him do anything before he got within ten feet of
the car to avoid that accident? A. No; he was just
riding along was all. Q. Just riding along and paying
no attention to the car? A. He was looking up. Q.

You didn't notice him paying any attention to the car? A. Just like anyone else riding and looking up. Q. Was he looking towards the car? A. Yes, sir. Q. He was? A. Yes, sir. Q. You think he saw the car? A. I think he did; yes. Q. Kept coming right toward the car? A. Right then he did."

On his re-direct examination the witness testified as follows: "You mean to tell Mr. Knight at the time you saw this man the first time he was looking at the street car? A. Not the first time, that was when he went to turn. Q. That was when he went to turn? A. Yes, sir. Q. These two young men were riding along; which way were their faces turned when you saw them first? A. Looking right at us in the car. Q. No, I mean when you first saw them? A. When I first saw them? Q. Yes? A. Just riding along talking. Q. And looking ahead of them, looking along? A. Like any one would ride along. Q. Did they give any appearance of knowing that the street car was approaching? A. No, sir. Q. Mr. Knight asked you if you had any claim against the street car company? A. Yes. Q. Have you got any feeling against these people? A. None only that claim is all. Q. That have anything to do with your testifying in this case? A. Not one bit; no, sir."

We take the following excerpt from the cross-examination of Mrs. Lillie Felts, the second witness introduced by the plaintiff: "Q. You saw these two men on the motorcycles pass by your house laughing and talking, did you? A. Yes. Q. Going towards the car track and kept going right on towards it? A. Yes, sir. Q. Paying no attention to the car? A. Well, they were riding along ordinarily like everybody else. Q. They paid no attention to the car did they, as far as you could see?

A.   No, they didn't seem to pay any attention; they were not looking in that direction; they were looking straight ahead, seemed to be.   Q.   Did you see the car?   A. Yes, sir.   Q.   Could they have seen that car?   A.   If they had looked that way they could have seen the car. Q.   If they had looked that way they could have seen the car, but they were riding along talking and laughing and going towards the track and paying no attention to the car; isn't that a fact?   Isn't that a fact, Mrs. Felts? A.   They were not talking and laughing so much after they passed my house; they were not laughing so loud; they laughed right before they passed the house, but afterwards they rode along like every one else.   Q.   Paid no attention to the car?   A.   No, sir."

W. S. Robles, a witness on behalf of the plaintiff, testified that he and the deceased were returning from Sulphur Springs to Tampa on their motorcycles and that just before the collision he saw the approaching car and "hollowed to him (the deceased) to look out for the car and put on my brakes."   The witness then proceeded to testify on his direct examination as follows:   "Q.   What did he do?   A.   He immediately put on his brakes and turned over to the right.   Q.   As quickly as you saw that car, you hollowed to Bourquardez to look out for the car, he immediately applied his brake and turned to the right?   A.   Yes, sir.   Q.   What did he turn to the right for?   A.   To shun the car.   Q.   To keep the car from striking him?   A.   Yes, sir.   Q.   Now, from the time that you first saw this car, did you at any time hear that car sound its gong before striking that young man?   A. No, sir; I did not.   Q.   From the time you first saw the car until the car struck this man was its speed slackened at all?   A.   On the car?   Q.   The street car?   A.   Not that I could tell; no, sir.   Q.   Not that you could tell?   A.

No, sir. Q. What—did you make every effort to stop your motorcycle? A. I did. Q. Did you succeed in doing it by running in the —? A. Yes, sir. Q. You were compelled to go in the ditch to save yourself? A. Yes, sir. Q. How far were you back of young Bourquardez? A. About ten feet. Q. About ten feet? A. Yes, sir. Q. And even with that leeway, you were compelled to go in the ditch to save yourself? A. Yes. Q. Now, Mr. Robles, did the street car hit Bourquardez or did Bourquardez run into the street car? A. The street car hit Bourquardez. Q. Did it hit the rear or the front of his motorcycle? A. It seemed to hit the rear. Q. Hit the rear—While you gentlemen were riding along approaching this crossing, were you looking down on the ground, or looking away, or riding in a careless manner? A. No, sir; I was looking ahead. Q. And no warning was given you by the car of its approach? A. No, sir. Q. Now, when you first saw the car—the street car—please tell these gentlemen whether the street car was further from the crossing than the motorcycles? A. The street car was farther from the crossing than we were."

On his cross-examination the witness testified: "Q. Do you think that Bourquardez heard you hollow to him? A. Yes, sir. Q. You think he did? A. Yes, sir. Q. Well, now, just tell me, please, Wesley, what Bourquardez did when you hollowed to him? A. Well, he applied his brakes and turned over to the right on the right side of the road. Q. Yet you were eighty feet from the track and couldn't escape hitting that car? A. He didn't. Q. Don't you really think that he was really going faster than twenty miles an hour? A. No, sir; I did not. Q. You really believe when he was eighty or ninety feet from the track that he heard you call to him, and that he im-

mediately applied his brakes, and yet he couldn't avoid running into that car—do you believe that? A. I certainly do. Q. In answer to a question propounded to you at the coroner's inquest, asking you to go ahead and state what you know about this, didn't you give this answer: 'Well, we was coming down between Florida avenue and Nebraska—but the name of the road—I don't know the name of the road at the end of Florida avenue—between Florida and Nebraska—and we got in about one hundred feet, I would say, of the car line and I seen the car coming past the house this side of the road and I hollowed to Douard, who was ahead of me about ten feet, I hollowed 'look out for the car,' and I put on my brakes, and he went on, right on, but put on brakes too, I suppose, I don't know whether his brakes working, or whether he used them or not, but he was on his pedal, and he went on and run right in front of the car, on the right side of the road, and when the car struck him he was about in the middle of the track, and at the time it struck him I was in about thirty feet of the car line, and it knocked him off and the car run over him, then the car covered him, and I didn't see him any more, and I rolled up in ten feet of the track, and rolled over in the ditch, and got up, and when I got up the car had carried him down the road with the machine fifty yards or more, and after that I stayed there a few minutes and some fellows came running back, and I talked with them a few minutes and then I got on my machine and went towards the Springs.' Did you answer that question that way? A. I don't remember whether I did or not, those exact words—I don't think though that I said fifty yards. Q. Eh? You don't remember whether you made that statement or not? A. No, sir; not exactly—no, sir. Q. Will you say that you did not? A. No, sir; I don't remember that I did.

I don't remember the exact words. Q. Now, Mr. Robles, you couldn't see whether Mr. Bourquardez put on his brakes or not, could you? A. I could see him raise up on his pedals. Q. You couldn't see whether he was putting on his brakes or not? A. Of course, I couldn't swear that he had his brakes on; no, sir. Q. As a matter of fact you think he had his brakes on, but really you don't know whether he did or not at that time, do you? A. I think he did, that is all. Q. You say that when the car struck Bourquardez you were about ten feet from the car and you ran into the ditch? A. In about ten feet of the car where I ran into the ditch, yes, sir. Q. This motor-cycle you were running was an Indian? A. No, sir. Q. Thor? A. Thor. Q. The one Bourquardez was running was an Indian? A. Indian. Q. Do you know what is the rate of horse-power of the machine he was riding? A. Seven horse-power. Q. And the horse-power of the machine you were on? A. Seven. Q. This road proceeding up to the car track, was it tolerably smooth? A. Yes, sir. Q. Paved road? A. Yes, sir. Q. What was it paved with—shell? A. Shell road. Q. Shell road and tolerably smooth road? A. Yes, sir. Q. Now, when you hollowed to him, and which you say you did when you were about eighty or ninety feet from the track, did you see him look towards the car? A. He looked ahead; I don't remember whether he looked towards the car. Q. He kept riding on? A. Yes, sure. Q. Straight towards the track? A. Turned to the right. Q. Isn't it a fact that he didn't turn towards the right? A. No, sir; he turned on the right side of the road immediately when I hollowed. Q. How did he run into the car then? A. Of course he went on up. Q. How did he run into the car? A. He wasn't right in the middle of the road; he was on the

right side of the road. Q. You say you hollowed to him about eighty or ninety feet from the track and he turned to the right. A. Yes, sir. Q. How could he have hit the car unless he went straight ahead? A. He was on the left hand side of the road, right hand on the left hand side. Q. Went kind of cat-a-cornered? A. Kind of cat-a-cornered over on the right side. Q. Nothing to prevent him turning on the right side? A. The ditch was there. Q. He could have gone into the ditch, couldn't he; you did? A. Yes, I did. Q. And he could have done the same thing? A. Probably he could. Q. He could, couldn't he? A. I don't say that he could. Q. You did? A. Yes, sir. Q. And didn't get killed? A. No, sir. Q. And you don't think that Bourquardez saw that car until you called his attention to it, do you? A. No, sir. Q. How close were you to him when you called his attention to this car, Mr. Robles? A. About ten feet. Q. You and he had been riding along talking to each other? A. We had been, yes. Q. Do you know how far before that you ceased talking to him? A. No, sir; I do not. Q. Neither of you were thinking of any danger or any trouble? A. I was not. Q. Just riding along? A. Yes, sir. Q. Talking to each other? A. Yes, sir. Q. And finally you saw the car and called his attention to it? A. Yes, sir. Q. As soon as you saw the car, did you commence putting brakes on your motor? A. I did. Q. And at the same time hollowed at Bourquardez? A. Yes, sir. Q. Do you know whether or not there was anything the matter with the brakes on his motorcycle? A. I think not. Q. Was there anything the matter with the brakes on your motorcycle? A. No, sir. Q. Mr. Robles, there was no reason why he could not have seen that car just as soon as you saw it? A. If he had looked? Q. If he had

looked, he could have seen it just as well as you could? A. Yes, sir. Q. Are you familiar with that crossing? A. Yes, sir. Q. You have been there often? A. Yes, sir. Q. Had he been there often? A. Yes, sir. Q. Bourquardez was born in this county was he not? A. I couldn't tell you. Q. How long have you known him? A. I have been knowing him about four years, I guess. Q. You had been knowing him about four years? A. Yes, sir. Q. Do you know where he lives with respect to that crossing? A. Yes, sir. Q. How far from there? A. He lives about two and a half miles from the crossing. Q. You have been with him quite frequently? A. Yes, sir. Q. And you and he were great friends? A. Yes, sir. Q. Been riding a good deal and riding with him a good deal? A. Yes, sir. Q. And both familiar with that crossing weren't you? A. Yes, sir. Q. How far was that crossing from Sulphur Springs, about? A. Probably half a mile. Q. Probably half a mile? A. Yes, sir. Q. Sulphur Springs is how far from Tampa? A. I believe they call it five miles. Q. Was that crossing there in the country? A. Yes, sir. Q. Several miles from the city limits of Tampa? A. Yes, sir. Q. There were not many houses around there? A. Not right there; no, sir."

No person shall recover damages from a railroad company for injury to himself or his property, where the same is done by his consent, or is caused by his own negligence. If the complainant and the agents of the company are both at fault, the former may recover, but the damages shall be diminished or increased by the jury in proportion to the amount of default attributable to him. Sec. 3149 Gen. Stats. of 1906, Compiled Laws of 1914.

We see no useful purpose to be accomplished by copy-

ing further portions of the testimony of the different witnesses either for the plaintiff or the defendant or even attempting a resume thereof. We have given all the evidence adduced our most careful consideration and after so doing are impelled to the conclusion that the plaintiff .is not entitled to a recovery. In other words, we think that the evidence is insufficient to support the verdict. In our opinion, the plaintiff has failed to sustain the allegations of his declaration. After giving due consideration to all the evidence, we are of the opinion that the evidence affirmatively shows that the deceased failed to exercise that degree of prudence and caution under the existing circumstances which the risks required, but so negligently rode his motorcycle upon the car track as to bring about a collision between his motorcycle and the approaching car as to occasion his death. We think that the principles announced in Seaboard Air Line Ry. v. Tomberlin, 70 Fla. 435, 70 South. Rep. 437, are controlling in the instant case. Also see Atlantic Coast Line v. Miller, 53 Fla. 246, 44 South. Rep. 247, and Live Oak, Perry & Gulf R. Co. v. Miller, decided here at the present term. We also refer to Louisville & N. R. Co. v. Padgett, 71 Fla. 90, 70 South. Rep., 998; Seaboard Air Line R. Co. v. Barwick, 51 Fla. 304, 41 South. Rep. 70; Seaboard Air Line Ry. v. Smith, 53 Fla. 375, 43 South. Rep. 235; Wade v. Louisville & N. R. Co., 54 Fla. 277, 45 South. Rep. 472. The evidence shows that the fatal injury to the deceased was "caused by his own negligence," therefore by the terms of the statute, Section 3149 of the General Statutes, copied above, the plaintiff should not recover damages.

The judgment must be reversed.

TAYLOR, C. J., and WHITFIELD and ELLIS, JJ., concur.

COCKRELL, J., dissents.