FLORIDA POWER & LIGHT COMPANY, a Florida Corporation, v. DEWEY BRIDGEMAN, ANNIE BRIDGEMAN, FARLEY BRIDGEMAN, C. J. BRIDGEMAN, all minors, by their next friend, H. R. BRIDGEMAN, and MAUD BRIDGEMAN HAWKINS, joined by her husband and next friend, J. H. HAWKINS.

182 So. 911.

Division B.

Opinion Filed February 14, 1938.

Rehearing Denied April 16, 1938.

196

198

*Patterson, Blackwell & Knight,* for Plaintiff in Error;

*Henry L. Williford, James E. Kirk, Randolph Calhoun* and *John L. Early,* for Defendants in Error.

PER CURIAM.—This is an action brought by the minor children of Mrs. Pauline Bridgeman, a widow, under the Florida death by wrongful Act statutes, Chapter 7047, 7048, Compiled General Laws of Florida. At the time that Mrs. Bridgeman met her death on November 6, 1934, all of her six children were under twenty-one years of age, and at the time the action was brought none of them had reached their majority; but at the time Mrs. Bridgeman was electrocuted, one of her daughters was married and another daughter married between that time and the time that the action was commenced. All of the children were joined as plaintiffs in this case, but during the course of the trial, the plaintiffs moved to dismiss Jane Bridgeman Rigby, who was married prior to her mother's death, as a party plaintiff. The motion was granted. This left five of the children of the deceased widow as plaintiffs; all of them being unmarried at the time that Mrs. Bridgeman met her death, but one of them, Maud Bridgeman Hawkins, had married by the time this action was brought.

The evidence in this case is conflicting and disputed, but in the main is substantially as follows: On the 6th day of November, 1934, around six o'clock in the evening two automobiles (one driven by a Mr. Alderman and one driven by a Mr. Jordan) collided at the corner of Bahia Vista Street and Tuttle Avenue, in Sarasota, Florida. After colliding they, or one of them, struck a pole which was situated near the corner and a foot or so from the paved part of the street, breaking it off at its base, but without causing

it to actually fall as it was supported somewhat by a series of wires extending both north and south and east and west.

The pole was owned by the Peninsular Telephone Company, but at the time of the accident it supported a private telephone line and electric transmission wires carrying from 22,000 to 66,000 volts belonging to the Florida Power and Light Company (as well as wires belonging to the telephone company). In the accident, Mr. Jordan was injured and was taken by automobile to the Sarasota Hospital.

Plaintiffs introduced considerable evidence to show that the pole was rotten and unfit to be used for the purpose for which it was employed; while defendant introduced testimony to the effect that the heart of the pole was solid and that just the outer layer of the pole was rotten and that the pole was a good one and perfectly suited to carry their lines and but for the automobile accident which could not be foreseen or anticipated that the pole would not have broken, and that although the pole was broken by the accident the wires held it up.

Sometime after the accident, testimony by both sides fixes the time at from fifteen minutes to an hour, Mrs. Bridgeman, a widow, was discovered about a hundred and seventy-five yards from the pole at a point just off of Tuttle Avenue. She had come into contact with the defendant's telephone wire which was carrying about 2300 volts of electricity from contact with the uninsulated primaries also maintained by the defendant company. The wire had fallen to, or very close to, the ground. There were no eye witnesses to the tragedy, so far as is known. It is difficult to tell from the testimony exactly how long transpired between the time that the cars collided on the corner and the time that deceased came in contact with the wire. Plaintiffs introduced evidence to show that it was daylight and that a crowd assembled at the corner at the time of the

accident, but that when Mrs. Bridgeman was found on the wire that it was dark. One of the doctors testified that it would take only a few seconds for the wire to burn the ankle to the extent that it was burned when the body was discovered.

Evidence was introduced by the plaintiff tending to show that the Electric Company was notified soon after the accident that wires were down near the place where the cars collided but that the Company did not cut off the electricity for over an hour later when they had discovered that some-one had come into contact with the wire; while defendant introduced testimony tending to show that they sent out their employees to find the trouble and that they cut the wires and shut off the electricity without delay and that they acted hastily and without negligence as soon as they were notified that a wire was down. They also contended that the plaintiffs' mother would have seen the wire splut-tering, if it was on the ground when she came along, and would have avoided it, but that the wire must have fallen on Mrs. Bridgeman, and no time elapsed between the time that they were notified and the time that Mrs. Bridgeman met her death, as she was already dead when they were no-tified that the wires were down. They do not support this contention with any evidence, however.

While Mrs. Bridgeman's earnings for part time work, were comparatively small, evidence was introduced to show that the deceased was a kind and loving mother and that she devoted her entire time to the support and care of her children.

Maude Bridgeman Hawkins testified that she was mar-ried, after the death of her mother, on November 16, 1934, and that she was fourteen years old at the time; that the other plaintiffs' ages were as follows at the time of the ac-cident: C. J. was 16, Farley was 13, Dewey was 4, Annie

was 6. It was stipulated by counsel that according to the American Experience Table of Mortality that the expectancy of life of a person 36 years of age—the age of Mrs. Bridgeman—is 31.07, years.

The jury was instructed and after deliberation awarded a verdict for the plaintiffs for $15,000.00. Defendants' motion for new trial was denied.

The defendant contends that its demurrer to the first, second and third counts of the plaintiffs' declaration on the grounds that no negligence is charged should not have been overruled by the Court.

Count one of the declaration, after alleging that defendant owned, controlled and operated certain electric power lines over and by means of which it conveyed in the City of Sarasota, Florida, and supplied the public for hire, electric power for lighting and other purposes and used wires strung along the streets of said city, and the ownership by the defendant of uninsulated wires and power lines on Tuttle Avenue in said city, over which currents of electricity were conducted of a high voltage, then alleged that the defendant on said date negligently permitted an uninsulated wire charged with a highly dangerous current of electricity, to be exposed on Tuttle Avenue in said city and as a result thereof plaintiffs' mother came into contact with said wire.

The second count of the declaration in addition to containing the allegations of count one, alleges that the wire was exposed at a point where people passed and repassed and where it was liable to come in contact with such people. Count three contains the same allegations as count two and in addition alleges that defendant knowing or by reasonable observance of diligence, could or should have known that plaintiffs' mother or some other person would probably be injured or killed by said wire.

It is our opinion that the above counts do allege negligence on the part of the defendant and are not subject to demurrer on that score. Although those engaged in transmitting current for domestic use are not insurers (Key West Electric Co. v. Roberts, 81 Fla. 743, 89 So. 122; Stark v. Holtzclaw, 90 Fla. 205, 105 So. 330) they are held to a *high degree* of care. See Key West Electric Co. v. Roberts, *supra*.

In the first count the negligence alleged is that the defendant negligently permitted one of their uninsulated wires, charged with a highly dangerous current of electricity, to be *exposed* on Tuttle Avenue. The defendants have interpreted this count to mean that the negligence charged is maintaining uninsulated wires, and have cited considerable authority to show that wires properly strung on poles and so located that people cannot reasonably be expected to come in contact with them is not negligence, even though they may carry a deadly current of electricity. The defendants have probably expressed the view of the majority of the courts on this question but they have misinterpreted the meaning of the count. These counts allege that the Company negligently allowed these uninsulated wires to be *exposed* on Tuttle Avenue and as a consequence the plaintiffs' mother came into contact with the wire and was killed. Curtis, a leading authority on the subject of electricity, on pages 904 and 906 of his treatise on the subject states:

"The presumption of negligence is almost universally applied where travelers along a highway come in contact with a wire charged with a deadly current of electricity. The fact that a person while traveling along a highway, is injured by contact with a highly charged electric wire raises a presumption of negligence on the part of the company maintaining the wire. This rule applies to a wire not nor-

mally dangerous, such as a telephone or telegraph wire, which in falling comes in contact with a wire conveying a dangerous current and carries the current to the street." Citing numerous cases.

In the above counts it is stated that the Company owned and maintained the wires; that they were charged with highly dangerous currents of electricity and that defendant negligently permitted one of these uninsulated wires to be exposed on Tuttle Avenue, and that as a result thereof plaintiffs' mother came into contact with said wire. The demurrer admitted these facts, which raise a *prima facie* case for the plaintiffs, and so the court properly overruled the demurrer to these counts.

The appellants next contend that the trial judge erred in overruling the demurrer to counts one to nine, inclusive, in that they *fail to show the relation between the plaintiffs' mother and the defendant Company* out of which the duty to avoid negligence is supposed to have arisen under the law.

To support their contention, the appellants cite the case of Woodcock v. Wilcox, 98 Fla. 14, 122 So. 789 (1929) where this Court held:

"But the rule is equally well settled that a declaration in an action for damages resulting from negligence should set forth the ultimate facts showing the relation between the parties out of which the duty to avoid negligence arises under the law. These facts should be so stated that the duty may appear plainly from them as alleged. Coombs v. Rice, 64 Fla. 202, 59 So. 958; Cooperative Sanitary Baking Co. v. Shields, 71 Fla. 110, 70 So. 934; Ingram-Dekle Lumber Company v. Geiger, 71 Fla. 390, 71 So. 552; Warfield v. Hepburn, 62 Fla. 409, 57 So. 618; 20 R. C. L. 10; Christopher Co. v. Russell, 63 Fla. 191, 58 So. 45, Ann. Cas.

1913 C., 564; Crandall's Fla. Common Law Practice 109; Carson's Common Law Pleading 113."

Appellants also cite that part of the case of Carter v. J. Ray Arnold Lumber Company, 83 Fla. 370, 91 So. 893 (1922) where it was stated:

"Actionable negligence arises where injury to one person is proximately caused by the failure of another to exercise such reasonable care and diligence as should have been exercised under the circumstances, *in view of the relation of the parties* as to each other at the time, and the complaining party is not guilty of such contributory negligence as bars recovery under the law applicable to the case. * * *

"In an action for negligent injury, it may be necessary only to allege ultimate facts showing the relation of the parties and the circumstances out of which the duty to avoid the negligence arises, and the act or omission that proximately caused the injury, coupled with a statement that such negligent act was negligently done or omitted."

Appellants further cite Freeman's Annotation in 100 Am. St. Rep. 538, entitled "Duties and Liabilities of Electric Corporation," as follows:

"As to mere trespassers or licensees, an electric corporation is ordinarily under no legal obligation other than to do them no willful or wanton harm. McCaughna v. Owasso, etc., Electric Co., 129 Mich. 407, 95 Am. St. Rep. 441; 89 N. W. 73; Keefe v. Narragansett Elect. Co., 21 R. I. 575, 43 Atl. 542."

The question of whether or not the decedent was a trespasser does not seem to have been raised in the lower court and under the decisions of this Court cannot therefore be raised here. In the case of St. Johns Electric Co. v. Lawler, 90 Fla. 188, 105 So. 818, the declaration alleged: that the elements caused the fall or lowering of a dangerous wire at

a point on the beach on Anastasia Island, such as to constitute a menace, that defendant could or should have known of the condition of this wire and the plaintiff's decedent while engaged in traversing the beach at such point, came in contact with said wire. The Court in its opinion, speaking through Mr. Justice WHITFIELD, said:

"It is not definitely alleged that the decedent had a right to be at the place where he lost his life, but no specific objection was made on this point. It may be fairly inferred from the allegation and more particularly from the evidence that the decedent was at a point where he had a right to be."

All of the counts of the declaration, except count one, allege that the place where the plaintiff's mother came in contact with the wire was where people pass and repass, where pedestrians had a right to be and to pass and repass. As to count one, the allegations of that count were sufficient to show the relationship between the parties, as it is alleged that the wires were exposed *on* Tuttle Avenue in said city. The Court can take judicial knowledge of the fact that anyone is entitled to the use of the streets and highways maintained by the municipalities of this State and that a person coming into contact with a wire on such a public street would not be a trespasser, and of course it is the duty of electric companies to so maintain their wires as not to endanger persons passing along the streets.

All the testimony shows that the plaintiffs' mother was found on Tuttle Avenue where the path runs up to the Bank, at the edge of the ditch three or eight feet (testimony varies as to the distance) from the paved part of Tuttle Avenue and that there were no paved sidewalks there.

In 20 C. J. 350 we find the law to be:

"Electric Companies are liable for injuries by electric current resulting from their negligence to a person on a public thoroughfare. Persons or companies operating systems for the transmission of electricity over public highways owe to the public the duty of properly constructing and maintaining their poles and wires and of exercising, for the protection of all persons legally using the highways, the high degree of care commensurate with the danger." * * *

"The doctrine of non-liability to trespassers or licensees has been applied to relieve defendant of liability where the trespass or license was with respect to the property of a third person and not that of the defendant. But according to the apparent weight of authority that doctrine has no application to such class of cases, because conceding that plaintiff was a trespasser as to the owner, he was not a trespasser as to the defendant, and the defendant may be held liable for negligence in failing to exercise proper care and precaution to prevent injury, not only as to persons who had a right to be at the place where the injury occurred, but also to persons whom defendant should reasonably have anticipated might be present and exposed to danger at that place, as in the case of places to which children or other persons are accustomed to resort although without technical right to be at such places."

According to this doctrine, which seems to be correct in principle, the Electric Company is not relieved of duty to the plaintiffs' mother just because the path may have been on private land, although it is doubtful that the testimony establishes such to be the case. The case of Key West Electric Company v. Roberts, *supra,* did not change the doctrine in Florida. The facts in that case are different and the Court decided the case on other grounds. The doctrine as stated in the above quotation from Corpus Juris

is the weight of authority according to an annotation in 56 A. L. R., p. 1030. It appears that the counts of the declaration do allege ultimate facts showing the relationship of the decedent and the Electric Company was such that the Electric Company owed her the duty of not negligently causing her death; and that the Electric Company was charged with a high degree of care in handling. of its dangerous business of transmission of electricity is well settled.

It was not necessary for the plaintiff to anticipate or rebut contributory negligence, or to allege that plaintiffs' mother was not a trespasser, or to allege that she did not commit suicide.

The trial judge did not err in his ruling on the demurrer to these counts on the ground stated.

The third question may be stated as follows: May a daughter under twenty-one years of age maintain an action for the wrongful death of her mother when said daughter was married prior to the commencement of the suit, but was unmarried at the time her mother was killed, and when her father had predeceased the mother?

Chapter 7048, Compiled General Laws of 1927, reads:

"Every such action shall be brought by and in the name of the widow or husband, as the case may be, and where there is neither widow or husband surviving the deceased, then the minor child or children may maintain an action; and where there is neither widow nor husband nor minor child or children then the action may be maintained by any person or persons dependent on such person killed for support; and where there is neither of the above classes of persons to sue, then the action may be maintained by the executor or administrator, as the case may be, of the person killed. * * *."

One of the decedent's daughters was not yet twenty-one years of age, but was married at the time of the death of her mother; another minor daughter was married between the time of the accident and the time that this action was commenced. Plaintiff eliminated the first daughter as a party plaintiff, but refused to dismiss the minor daughter who was not married at the time her mother was killed. The appellants claim that this is a misjoinder of parties and that the married daughter was no longer a "minor" at the time that she "maintained" the suit under the authority of the above quoted statute.

This Court held in Riley v. Holmer (1930), 100 Fla. 938; 131 So. 330:

"Under our law both males and females are minors until they reach the age of twenty-one years. Beekman v. Beekman, 53 Fla. 858, 43 So. 923. This was the Common Law Rule. To what extent the disability of minority may be removed depends on statutory and constitutional provisions. 31 C. J. 986."

The above was applied to a case where a male minor of 18 years was claiming that, being married, his disabilities were removed and that he was no longer a minor and could vote. Chapter 7048, as above quoted, did not state that the action was to be brought by the "dependent" minor children and we do not think that this Court can or should read the word "dependent" into the statute, as it does not appear that this was the intention of the Legislature.

"Minor," as used in this statute, refers to anyone under twenty-one years of age. The fact that one of the parties was married would only have the effect of changing the quantum of damages. The statute states that "the jury shall give such damages as the party or parties entitled to sue may have sustained by reason of the death of the party killed."

As the married minor daughter is emancipated, the relation between this child and the parent has become changed and the duties owed to the minor by the parent are greatly diminished and thus the damages recoverable by a married minor for the death of her mother may be' slight as the damages sustained are not so great.

In the case at bar there can be no doubt about the right of the minor daughter, who was married after her mother's death, to join as a party plaintiff, as she has suffered damages for which she is entitled to sue. The time at which we determine the status of the child is at the time of the death of the parent. The subsequent marriage of the minor daughter cannot take away her right to maintain her action for damages she has suffered because of the loss of her parent. This right became vested before her marriage and her subsequent marriage does not so change her status so as to deprive her of this right nor does it make her an adult.

It is contended that certain testimony introduced in the lower court was part of the *res gestae* and should have been allowed to stand. This evidence was clearly hearsay and could not by any stretch of the imagination be considered as a part of the *res gestae*. The evidence was clearly inadmissible and the lower court correctly ruled it so.

The next question raised is: Should the hospital record showing the time of the admission to the hospital of Mr. Jordan, who was injured in the automobile collision at the corner of Bahia Vista and Tuttle Avenue, be admitted for the purpose of showing the time of the accident? The trial court sustained an objection to the introduction of this record "for the time being."

Appellants contend that the record should be admissible: First, as an exception to the hearsay rule as being a public record. Second, as a private record made in the regular course of business. Let us examine this record and see

whether it could properly be admitted as being a public record and therefore an exception to the hearsay rule.

Section 3287 C. G. L. provides as follows:

"All superintendents or managers, or other persons in charge of hospitals, almshouses, lying-in or other institutions, public or private, to which persons resort for the treatment of diseases, confinement, or are committed by process of law, shall make a record of all the personal and statistical particulars relative to the inmates in their institutions at the date of the approval of this law, which are required in the forms of the certificates provided for by this chapter, as directed by the State Registrar; and thereafter such records shall be, by them made for all future inmates at the time of their admittance. And in case of persons admitted or committed for the treatment of disease, the physician in charge shall specify for entry, in the record, the nature of the disease and where, in his opinion, it was contracted, or if injured, the nature and cause thereof. The personal particulars and information required by this section shall be obtained from the individual himself if it is practical to do so; and when they cannot be so obtained, they shall be obtained in as complete a manner as possible from relatives, friends, or other persons acquainted with the facts."

It is the appellants' contention that the hospital record was necessary under the above statute and that it should be admitted into evidence as a public record.

The hospital record should not have been admitted as a public record because:

1. The above statute apparently does not require the exact time of admittance to be a part of the record.

2. It appears from the transcript that the person making the hospital record was not a "superintendent or manager

or other persons in charge of hospitals," etc., but was merely an unidentified floor nurse.

In Section 162, Greenleaf on Evidence, it is stated:

"The guaranty of trustworthiness justifying the exception is usually said to be the official oath of office; but an additional reason and requirement in England, is said to be the publicity of the document, which insures the probability of possible errors by the public who have access to it and the subjective incentive on the part of the official to state correctly that which the public's inspection would detect as false if he recorded falsely. The later reason, as accepted in England, limits the common law scope of the principle in its application, but it has rarely been advanced in this country, and seems indeed to be a modern innovation in England." Before the opinion of Lord Blackburn in Surla v. Freccia, 21 Eng. Ruling Cases, 671, it does not appear that publicity of the document was even necessary in England.

In some jurisdictions it has been held that a hospital record is protected by the privileged communication statutes, and is therefore inadmissible in those states unless the privilege has been waived by the patient. See Price v. Standard Life and Accident Insurance Co. (Min.) 95 N. W. 1118; Metropolitan Life Ins. Co. v. McSwain (Miss.) 115 So. 555; Smart v. Kansas City (Mo.) 105 S. W. 709, and Toole v. Franklin Investment Co. (Wash.) 291 Pac. 1101.

"At common law no privilege existed as to communications between physician and patient, and the privilege is of statutory origin in every State in which it obtains." 28 R. C. L. 532.

The Common Law rule has not been abrogated by statute in this State and so the record cannot be held inadmissable on this ground. A hospital record, when properly identified, may be admissible in this State for some purposes, but

it is our opinion that the record should not have been admitted into evidence as a public record in this case for the reasons stated.

It does not appear that the record should have been admitted as a private record made in the regular course of business. It is not shown by the testimony that the entry was made contemporaneous with the transaction sought to be recorded, nor does it appear with certainty that the person who made the record was one authorized to do so.

Besides these objections to the introduction of the hospital record to show the time of admittance of Mr. Jordan and thus try to establish the time of the accident, it may be added that the hospital record is not the *best* evidence in this case as to the time of the accident as there were a number of witnesses who either saw or heard the accident. Their testimony would be the best evidence. It was not shown that Mr. Jordan was taken straight to the hospital nor how long transpired between the collision and the time he was admitted to the hospital. Furthermore, it does not appear that the defendant ever got a final ruling on the admission of this evidence.

The evidence was properly rejected by the trial court.

The sixth and seventh questions raised by the appellant are primarily concerned with whether or not the Electric Company's negligence, if any, was the proximate cause of the accident. Besides the simple negligence charged in the first three counts of the declaration, the plaintiff charged the defendant Company with two acts of negligence:

1. That the Electric Company was negligent in stringing uninsulated high tension wires on a telephone pole that was decayed and unsafe.

2. That the Company was negligent in not turning off the electricity within a reasonable time after being notified or after learning that the wire was down.

It is contended by the defendant Company that the decedent met her death because of the automobile accident at the corner of Bahia Vista Street and Tuttle Avenue and that the negligence of the Electric Company in stringing their wires to the telephone pole in question, if there was any negligence in so doing, was not the proximate cause of the death of Mrs. Bridgeman.

The Alabama Court in the case of Alabama Power Company v. Curry, 153 So. 634, expresses the well-known principle that:

"When defendant is responsible for a condition, in itself harmless, but dangerous when another operative condition acts upon it, which defendant should know is likely to happen, and that injury would occur, defendant is held proximately responsible, and the negligence is in failure to use due care that such condition should not continue."

This Court, in the case of Startling v. City of Gainesville, 90 Fla. 613, 106 So. 425, speaking through Mr. Justice TERRELL, said:

"The law is well settled in this State that where two causes combined to produce an injury, both in their nature proximate, and one being a defect in the city street and the other some accident for which neither party is responsible, the city is liable provided the plaintiff was not at fault and the injury would not not have been sustained but for the defect in the street." (Cases cited.)

"It is universally agreed that if the damage is caused by the concurring force of the defendant's negligence and some other force for which he is not responsible, including the act of God, or superhuman force intervening, the defendant is nevertheless responsible if his negligence is one of the proximate causes of the damage, within the definition already given. It is also agreed that if the negligence of the defendant occurs with the other cause of the injury in point

of time and place, or otherwise so directly contributes to the plaintiff's damage that it is reasonably certain that the other cause alone would not have sufficed to produce it, the defendant is liable notwithstanding he may not have anticipated the interference of the superior force, which concurring with his own negligence produced the damage. But if the superior force would have produced the same damage whether the defendant had been negligent or not, his negligence is not deemed the cause of the injury. Brash v. City of St. Louis, 161 Mo. 433, 61 S. W. 808; Howe v. West Seattle Land and Improvement Company, 21 Wash. 594, 59 Pac. 495; 25 Cyc. 496."

And in the case of Seaboard Air Line Ry. Co. v. Watson, 94 Fla. 571, 113 S. 716, the Court held:

"In an action for injury alleged to be due to the negligence of the defendant, it is not defense that the act or omission charged was not the sole cause of the injury. If the defendant's act or omission was operative at the moment of the injury, he will be held liable therefor, although the injurious result was concurred in and contributed to by the act of a third person, or inevitable accident. The rule is thoroughly established that where an injury is the product of the combined negligence of two or more persons, such persons are jointly and severally liable to the person injured, and suit may be instituted against one or all of the wrongdoers; though the damage would not have occurred from the negligence of either alone."

As before mentioned, though an Electric Company is not an insurer, it is held to a high degree of care in the transmission of its deadly currents of electricty. The evidence was sufficient to go to the jury on this charge of negligence and we feel that the jury was justified in finding that the Electric Company's negligence was at least a contributing or concurring proximate cause of the death of Mrs. Bridge-

man, if they believed all the evidence introduced by plaintiff to show that the high tension wires were strung on the pole that was in a rotten and unsafe condition, and that the pole was not over a foot or so from the paved part of Bahia Vista Avenue and that there was no curb in front of the pole and that the Company had been notified or should have known of the condition of the pole.

As to the second charge of negligence found in counts 7, 8 and 9 of the declaration, based on the Electric Company's negligence in not cutting off the electricity within a reasonable time after being notified that the wire was down, there is a great conflict in the evidence. The appellants contend that as there were no eye witnesses that it is impossible to tell when Mrs. Bridgeman came into contact with the wire and that even had the Electric Company delayed in turning off the current, it is not shown that this delay was the proximate cause of Mrs. Bridgeman's death as the wire might have fallen on her. The plaintiffs have introduced evidence to show that a crowd gathered around the collision and that it was still daylight and that when the body was found on the wire it had gotten dark. One of the doctors also testified that the deceased's ankle was almost severed and that this could have happened from just a few seconds' contact with the wire. There is a great deal of conflict as to the length of time that transpired between the time that the two cars collided and when the Electric Company turned off the electricty, etc.

If there is evidence of negligence, the question of whether or not the negligence of the defendant was the proximate cause of the injury complained of is generally a question of fact for the jury to determine. See Western Union Telegraph Company v. Taylor, 94 Fla. 841, 114 So. 529; Seaboard Airline Ry. Co. v. Watson, 94 Fla. 571, 113 So. 716.

It is a close question whether or not the evidence was sufficient to justify the trial court in denying the defendant a directed verdict on these three counts.

The next question raised is, in substance: Did the court err in not defining the issues raised by the pleadings, but instead reciting substantially in full all of such pleadings, leaving it to the jury to determine for themselves what questions the case presented?

It appears from reading the entire charge as given by the trial judge that the jury was properly instructed and that the judge did not read the entire pleadings to the jury nor refer them to the pleadings for the issues nor abuse his discretion as to the form and style in which the instructions should be given. It is the duty of the trial judge to state to the jury the issues made by the pleadings and though it is generally held to be erroneous to read the pleadings to the jury or to refer them to the pleadings for the issues by way of instructing them in the law of the case, we do not find that this was done in the case at bar, and though the judge gave the substance of each count of the declaration and advised the jury of the issues involved therein, we feel that the charge was not improper nor calculated to mislead the jury.

Although we do not approve of the conduct of plaintiff's counsel in cross-examining defendant's manager concerning his sworn pleas, thus attempting to impeach him in the eyes of the jury, there was no objection made to this line of cross-examination and so the appellant is powerless to object at this late date. In argument to the jury, plaintiff's counsel referred to the plea again and reflected seriously upon the veracity of the witness, Jackson, who he said had sworn to a plea containing a "damnable lie." This was going too far. The defendant merely objected on the ground that the language was improper and prejudicial and there

was no such evidence before the jury. The court upheld this objection and also instructed the jury: "Those pleas have not been offered into evidence * * * they are not before the court and jury at this time as evidence and are not to be considered so by you gentlemen." If the appellant had desired to have the statement stricken or further instructions given he should have requested the court to do so.

While from the nature of the pleadings and evidence, this was one of those borderline cases which was most difficult to try below and to rule on here. Without committing some error, we think that the trial court handled the case very well indeed and with a desire to be fair and just to both sides and without any harmful and reversible error clearly appearing.

But in view of Mrs. Bridgeman's very limited earning capacity, the verdict was somewhat excessive. We realize that it is as difficult if not impossible to measure in money the loss of the parental influence and the value of a mother's love and care; but there was no intentional wrong charged or committed in this case. If defendants in error see fit to enter a remittitur of $2,500.00 within ten days from the going down of the mandate, the judgment will be affirmed. Otherwise the cause will stand reversed for a new trial.

WHITFIELD, P. J., and BROWN and CHAPMAN, J. J., concur.

TERRELL and BUFORD, J. J., concur in the opinion and judgment.

ON PETITION FOR REHEARING.

*Knight & Green,* for Plaintiff in Error;

*Henry L. Williford, James E. Kirk, Randolph Calhoun and John L. Early,* for Defendants in Error.

PER CURIAM.—As will appear from page 3 of this opinion, there was a conflict in the evidence, but that evidence was introduced by the plaintiff to show that the Electric Company was notified soon after the accident that the high tension wires were down near the place where the cars collide, but that the Company did not cut off the electricity for over an hour later when they discovered that someone had come into contact with the wire. This Court recognized that the question of proximate cause in this case was a close one, but this question was argued at length in both original briefs and the Court carefully considered this question before this opinion was written. Our reply to the argument of the petition is:

This Court clearly held that electric companies were not insurers, but they are held to a high degree of care. See page 5 of the opinion. It will appear from the opinion, bottom of page 15 and page 16, that this Court sufficiently considered the argument advanced here, and held that if the jury believed the evidence introduced by the plaintiff tending to show that these uninsulated high tension wires were strung on a rotten telephone pole which was in an unsafe condition and was not over a foot from the paved portion of Bahia Vista Avenue, and that there was no curb in front of the telephone pole, and the electric company had been notified or should have known of the condition of the pole, then it was a question for the jury to determine whether the electric company's negligence was at least a contributing or concurring proximate cause of the injury. If the above evidence was true, then certainly the electric company was not exercising a *high degree* of care.

As to the second point advanced in the petition for rehearing, it appears that if the jury believed from the evidence that the electric company was notified that a high tension wire was down and delayed for over an hour to

cut off the electricity, the jury was justified in finding the company negligent. We can see no dangerous precedent that may be set in requiring the electric company to move with all reasonable haste in cutting off the electricity when they are notified that something is amiss with their high tension wires, carrying upward of 22,000 volts of electricity, especially when such wires are strung along a main thoroughfare. Here evidence was introduced to show that an electric claxon notified the company of the trouble and that they were also notified by telephone, and that still they delayed for an hour to turn off the electricty. No "dangerous precedent" is set by holding on this evidence that the electric company should have turned off the electricity in that area without any undue delay upon being notified of high tension wires being down. Certainly it is often necessary that an entire area should have the electricity turned off for a few minutes rather than allow a wire carrying a highly deadly current of electricity to lie exposed on a main thoroughfare.

This Court has carefully considered every part of the argument here advanced and nothing is to be gained by a further rehashing of the questions. It appears, as was stated in the opinion, that this case is a borderline case, but it does not appear that any dangerous precedent is being set nor is the Power & Light Company required to be an *insurer*. Petition for rehearing denied.

ELLIS, C. J., and WHITFIELD, TERRELL, BROWN and CHAPMAN, J. J., concur.

BUFORD, J., concurs specially.

BUFORD, J. (concurring specially).—I concurred in the original opinion in this case and concur in the opinion rendered on rehearing, but I do not construe either opinion to mean that when an electrical power company is notified of trouble on a line it becomes its duty to cut off all current.

To do so would probably endanger more lives than it would protect. The legal duty is to immediately locate the trouble, ascertain the character and extent thereof and to with all reasonable speed do that which is found to be needful to protect lives and property from the dangers incident to the disarrangement of the flow of the electrical current.