DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

BARTLEY INVESTMENTS, LTD.,
a Florida limited partnership,

Appellant,

v.

TAMALA MENENDEZ,

Appellee.

No. 2D2024-1001

_____

December 19, 2025

Appeal from the Circuit Court for Hillsborough County; Paul L. Huey,
Judge.

Brandon S. Vesely and Robert E. Biasotti of The Florida Appellate Firm,
P.A., St. Petersburg, for Appellant.

Raymond T. Elligett, Jr., of Buell, Elligett, Farrior & Faircloth, Tampa;
and James A. Wardell of Wardell Law Firm, P.A., Tampa, for Appellee.

MORRIS, Judge.

Bartley Investments, Ltd. (Bartley), appeals from a final judgment
entered in favor of Tamala Menendez in her negligence action.
Menendez's negligence action arose after she was attacked at home by a
person that she alleged was a resident, drug dealer, drug purchaser, or
drug user who frequented a townhome owned by Bartley. Bartley argues
that the trial court erred by denying its motion to dismiss, motion for

directed verdict, and motion for judgment notwithstanding the verdict or for a new trial.  Bartley also argues that the trial court erred by denying its motion for setoff.  For the reasons explained herein, we affirm.

## BACKGROUND

Bartley is a small, family-owned business that invests in real estate.  Bartley owned sixteen units in a townhome community which is managed by a homeowners' association board of directors.  The community's day-to-day operations and security were managed by a property management company.  Menendez owned a townhome in the community in a different location and on a different block from the townhome owned by Bartley that is the subject of this case.

In July 2021 a homeless man, Shane Turner, broke into Menendez's fenced courtyard, beat her, and slammed her head into the ground while simultaneously trying to rape her.  A person nearby intervened, and police were called.  Turner was subsequently arrested, charged, and convicted of battery and attempted rape.  He is currently serving his sentence for the crimes.  During the trial in this case, evidence was presented that Turner frequented one of Bartley's townhomes during a time when it was occupied by people who may or may not have been authorized to live there.[1]

In her amended complaint,[2] Menendez alleged that Bartley had a duty to prevent a known dangerous condition from existing at Bartley's

---

[1] Rick Bartley, one of Bartley's owners, testified that the people did not have a lease or permission to be there.  However, testimony from some of Menendez's witnesses indicated that it appeared that the people had permission to be there because Rick Bartley was seen with them on at least two occasions.  For purposes of this opinion, we will refer to the occupants of the Bartley townhome as residents.

[2] Menendez's original complaint was dismissed.

townhome.  To support her claim of negligence, Menendez alleged that Bartley rented its townhome to drug dealers and allowed them to run a drug ring from the premises.  She further alleged that Bartley "knew the nature of the tenancy" or failed to take reasonable steps to investigate the tenants before renting to drug dealers.  Menendez alleged that Bartley "failed to conduct a sufficient background check before leasing the premises and/or failed to monitor the tenancy" to ensure that it did not pose a danger to others; she also alleged that Bartley failed to follow the rules and regulations of the townhome community designed to keep residents safe.  Menendez alleged that prior to the attack, Bartley had been informed via letters from the homeowners' association that the residents in the Bartley townhome were engaging in nuisance activities at the townhome and that the homeowners' association had received numerous complaints of significant traffic coming and going from the property and reports of drug sales.  According to Menendez's complaint, Bartley was also directly informed by others in the community about the activities of the residents, but Bartley failed to take any action.  Menendez alleged that Bartley representatives were seen at the townhome with the residents/drug dealers on numerous occasions.  Finally, Menendez alleged that despite all of this, Bartley failed to remove the known dangerous people conducting unlawful activity at the townhome, failed to warn other community residents of the known danger, and failed to take action to protect the other residents within the community.  Specifically addressing the attack, Menendez alleged that it was committed by "a drug purchaser/user/dealer or resident" of the Bartley townhome, leaving her with serious injuries.

Menendez also asserted claims against the homeowners' association and the property management company.  However, she

3

settled her claims with them prior to the trial, and they were dismissed from the case.

Bartley filed a motion to dismiss the amended complaint, arguing that Menendez failed to state a cause of action because it had no duty to protect her from the criminal acts of a third person. Specifically, Bartley contended that it had no special relationship with Menendez and no control over the assailant, the premises where the attack took place, or any instrumentality of harm. Bartley also denied knowing that its conduct would result in the type of injury suffered by Menendez.

In her response to Bartley's motion to dismiss, Menendez asserted that because all townhome owners in the community were required to be members of the homeowners' association, this subjected them to the rules and regulations governing the community. Thus she contended that this created a special relationship between Bartley and the other community residents to protect them from the foreseeable zone of risk created by Bartley allowing the Bartley townhome residents to deal drugs out of the townhome. She pointed out that Bartley had received two letters from the homeowners' association advising Bartley of the issues concerning the property and notifying Bartley that the activities were "a threat to the safety of the Association's residents[] and disturb[ed] the peace, quiet, and enjoyment of the community." She also asserted that Bartley had a special relationship with the residents of the Bartley townhome because it was the landlord of the property and was aware of the criminal activity occurring there.

The motion to dismiss the amended complaint was denied after a hearing.

At trial, Menendez's assailant, Turner, testified that he had gotten into a fight with two other men living in the Bartley townhome before the

4

attack, but he did not remember the facts of the actual attack on Menendez. He testified that his drugs of choice were methamphetamine and heroin, but he did not remember using drugs that day. He admitted knowing the residents living in the Bartley townhome. He also testified that the Bartley townhome was a "drug hole" and that the residents were selling drugs out of the townhome. He testified that he had purchased drugs at the Bartley townhome for six months or more before he moved in with the residents. He testified that there was a lot of drug dealing, fighting, and theft associated with "drug holes" and that based on what was happening at the Bartley townhome, he knew it was just a matter of time before someone got hurt. He also testified that if he and the other two residents had been evicted, the attack never would have happened because he would not have been there.

One neighbor whose back patio faced the back of the Bartley townhome testified that she observed the residents frequently intoxicated. She also observed drug deals, syringes, and an overdose. She testified that she had seen the activity escalate at the Bartley townhome with police being called on several occasions; she perceived the activities to be a threat to the others in the community. This particular neighbor witnessed the events preceding the attack. She observed Turner arguing with one of the Bartley townhome residents. She then observed Turner jumping fences to get into the patios of various townhomes. She speculated that he may have been on drugs, but she testified that he was likely looking to hide from police because she believed that he could see that she was on the phone. She observed Turner walking towards the main entrance road into the townhome community and then observed him climb into another patio of a

5

townhome on a different road. She phoned in the 911 call reporting the attack.

Rick—a twenty-five percent owner of Bartley Investments, Ltd.— controls the townhome in question. He testified that the last time he rented the townhome to anyone was from May 2020 to September 2020. He testified that the townhome was vacant from October 2020 until March 2021, when he discovered the residents living there. He denied knowing the residents, and he testified that they did not have a lease or permission to live there. The residents never paid rent. Rick testified that he hired his attorney to look into evicting the residents. While Rick maintained that the attorney told him he could handle the eviction, the attorney himself testified that he was never hired for an eviction or anything related to the townhome. Rick denied seeing the first letter from the homeowners' association.

The vice president of the property management company testified about receiving emails from community residents containing complaints about the Bartley townhome. The complaints involved parking issues relating to extra vehicles at the Bartley townhome as well as reports of other community residents witnessing hand-to-hand drug transactions.

Neighbors and homeowners' association board members also testified. One neighbor testified about her belief that drug deals were occurring. She testified that she anonymously called Rick on one occasion to discuss the conduct occurring at the townhome. She testified that he cursed her out and hung up on her. She saw Rick at the property for extended periods of time and believed that he knew drug activity was occurring because his vehicle was there while the drug activity was ongoing.

6

Two other neighbors, a husband and wife, testified that they observed Rick with the Bartley townhome residents on at least two occasions though the neighbors did not know that the residents were not authorized to be there at the time; the wife testified that it seemed like the residents had permission to be there. There was testimony that many people came and went from the townhome, and they were described as "meth heads" due to their physical appearance. The neighbors testified that they both told Rick that the residents were dealing drugs but nothing was done. The wife testified that others in the community were concerned about safety.

A security expert also testified. Based on her review of depositions, discovery materials, emails in evidence, and the homeowners' association rules, she offered three opinions: (1) the attack on Menendez was reasonably foreseeable due to the nature, frequency, and recency of the prior criminal activity; (2) the reported activities constituted a threat to the community residents as stated in the letters sent to Bartley; and (3) had appropriate measures been taken, such as removing the individuals residing in the townhome, "it was more likely than not that the incident would not have occurred." The security expert did not provide an opinion on the truthfulness of the emails that were in evidence. However, the security expert opined that it did not matter whether the residents were actual tenants or squatters because in either situation "they were still creating a hazardous condition on the premises."

An attorney for the law firm that represented the townhome community testified that the firm was notified that there had been multiple complaints about the Bartley townhome. As a result, the attorney sent a notice of violation via certified mail, with return receipt requested. The letter was mailed to the address listed on the property

7

appraiser's website, not to the legal address for Bartley. When asked if he received the return receipt, the attorney stated, "[I]t's anyone's guess whether or not we're going to get the return receipts back." The attorney never received a response to the letter from Bartley. However, after a second letter was sent, informing Bartley that the homeowners' association intended to seek injunctive relief, Bartley responded. The homeowners' association filed suit. The Bartley townhome residents were eventually removed, and the suit became moot.

Another twenty-five percent owner of Bartley—Allan Bartley—manages other Bartley investment properties, including others within the same townhome community. Allan was unaware of the problems at the subject townhome. Allan received the second letter from the homeowners' association about two weeks after it was mailed.[3] Allan had trouble reaching Rick to discuss the issues; during this time, Rick had been hospitalized due to health problems. Ultimately, Allan hired an attorney to start the eviction process on the Bartley townhome residents. Allan and Rick's brother—Dana Bartley—oversaw the eviction process.

Dana testified that he was not close to Rick, and Rick never told him about the Bartley townhome residents or alleged drug problems at the Bartley townhome. Allan was the person who told Dana about the residents. Dana eventually went to the property with the sheriff and had the residents removed.

Bartley moved for a directed verdict, arguing that it did not think it was foreseeable that "just because you've got squatters, even if they're doing drugs, [a person] would go 300-some feet away from the property and attack somebody." Bartley argued that adopting that view would

_____

[3] Rick testified that he, too, received the second letter in the mail.

permit every empty lot and every building to be a potential "type of hazard [that] would have to be boarded up and protected from everybody." Bartley argued that the attack did not happen on its property, that there was a good distance between the two properties, and that the attack was not committed by someone that it controlled. Bartley also asserted that as soon as it received notice of the issue, Allan acted to rectify the issue. Bartley contended that viewing all the facts, "under similar circumstances, you would not expect that similar result."

After hearing argument from Menendez's counsel, the trial court addressed the issue of proximate cause and noted that the Bartley townhome and Menendez's townhome were not that far apart and that Turner was able to easily get to Menendez's townhome on foot. The court then stated that it believed "there's enough here" to meet the directed verdict standard and "that's the kind of thing, you know, that, I think can happen." The trial court denied the motion for directed verdict.

The jury ultimately entered a verdict in favor of Menendez, finding that Bartley's negligence was a contributing cause of Menendez's loss, injury, or damages. The jury found that Menendez's total damages for medical expenses amounted to $399,390. The jury found that Menendez's total damages for pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, aggravation of a disease or physical defect, and loss of capacity for the enjoyment of life amounted to $3,500,000. The trial court entered a final judgment in the amount of $3,500,000.

Bartley subsequently filed two posttrial motions: (1) a motion for judgment notwithstanding the verdict (JNOV) or motion for new trial; and (2) a motion for setoff. After Menendez filed a combined response to both

9

of Bartley's motions, the trial court denied the motion for JNOV or new trial without a hearing.

In the motion for setoff, Bartley argued that Menendez sought identical damages from Bartley as well as the two other original defendants named in the suit: the homeowners' association and the property management firm. Menendez settled with the other defendants for $4,000,000. As a result of the other two defendants settling and being dismissed from the suit, only Bartley was listed as a defendant on the verdict form. Bartley argued that it was entitled to a setoff pursuant to sections 768.041(2), Florida Statutes (2023), and 46.015(2), Florida Statutes (2023). Bartley asserted that the setoff statutes precluded Menendez from recovering double damages from Bartley and the other two dismissed defendants because the damages arose from the same incident.

In Menendez's response on the setoff issue, she argued that joint and several liability has been eliminated for personal injury actions and that judgment against Bartley was based solely on its fault; she contended that the settlement with the homeowners' association and property management company did not duplicate the damages awarded against Bartley. Menendez noted that Bartley did not seek to have the other two settling defendants' names included on the verdict form and thus the jury determined Bartley was 100% liable.

After the trial court conducted a hearing on the setoff motion, the trial court denied the motion, citing caselaw that addressed the applicability of setoff statutes in light of section 768.81(3).

## ANALYSIS

In this appeal, Bartley argues that the trial court erred in denying the motion to dismiss the amended complaint because Florida law limits

10

negligence claims against landowners that are based on conduct of a third party that occurred off premises. Bartley also contends that the trial court erred in denying its motion for directed verdict because (1) there was no evidence that Bartley actually rented the townhome to the residents who were drug dealers and (2) even if Bartley had a limited duty to evict squatters or tenants, there was no foreseeable zone of risk for potential harm to others in the community because the allegations of drug use did not correlate with the risk of sexual assault to others in the community. Bartley also challenges the denial of its motion for JNOV or new trial, arguing again that Bartley had no legal duty to Menendez. Lastly, Bartley contends that the trial court erred in denying its motion for setoff.

## I.      Motion to Dismiss

"Because a ruling on a motion to dismiss for failure to state a cause of action is an issue of law, it is reviewable on appeal by the de novo standard of review." *Gulf Coast Transp., Inc. v. Hillsborough County*, 352 So. 3d 368, 374 (Fla. 2d DCA 2022) (quoting *Crocker v. Marks*, 856 So. 2d 1123, 1123 (Fla. 4th DCA 2003)).

"The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992) (quoting *Kaisner v. Kolb*, 543 So. 2d 732, 735 (Fla. 1989)). It is the "minimal threshold *legal* requirement for opening the courthouse doors." *Id.* (footnote omitted). "Where a defendant's conduct creates a *foreseeable zone of risk*, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." *Kaisner*, 543 So. 2d at 735 (emphasis added). "[A]s the risk

11

grows greater, so does the duty, because the risk to be perceived defines the duty that must be undertaken." *McCain*, 593 So. 2d at 503 (citing *J.G. Christopher Co. v. Russell*, 58 So. 45 (1912)).

> The statute books and case law . . . are not required to catalog and expressly proscribe every conceivable risk in order for it to give rise to a duty of care. Rather, each defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result.

*Id.* "*As to duty*, the proper inquiry for the reviewing appellate court is whether the defendant's conduct created a foreseeable zone of risk, *not* whether the defendant could foresee the specific injury that actually occurred." *Id.* at 504.

As to proximate cause, "foreseeability is concerned with the specific, narrow factual details of the case, not with the broader zone of risk the defendant created." *Id.* at 503. Proximate cause focuses on "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *Id.* at 502. "However, . . . it is immaterial that the defendant could not foresee the *precise* manner in which the injury occurred or its *exact* extent." *Id.* at 503 (citing *Restatement (Second) of Torts* § 435 (1965)). "[A]n injury caused by a freakish and improbable chain of events would not be 'proximate' precisely because it is unquestionably unforeseeable, even where the injury may have arisen from a zone of risk." *Id.* "The law does not impose liability for freak injuries that were utterly unpredictable in light of common human experience." *Id.*

Generally, "foreseeability as it relates to proximate causation . . . must be left to the fact-finder to resolve." *Id.* at 504. "Thus, where reasonable persons could differ as to whether the facts establish proximate causation—i.e., whether the *specific* injury was genuinely foreseeable or merely an improbable freak [event]—then the resolution of

12

the issue must be left to the fact-finder." *Id.* (first citing *Vining v. Avis Rent-A-Car Sys., Inc.,* 354 So. 2d 54, 56 (Fla. 1977); and then citing *Fla. Power & Light Co. v. Bridgeman,* 182 So. 911, 920 (Fla. 1938)). "The judge is free to take this matter from the fact-finder only where the facts are unequivocal, such as where the evidence supports no more than a single reasonable inference." *Id.* (citing *Tatom v. Seaboard Air Line Ry.,* 113 So. 671, 674(Fla. 1927)).

"Although a landowner is most commonly liable for injuries that occur on the property, there are occasions when a landowner may be liable for a dangerous condition that results in injury off the premises." *Johnson v. Howard Mark Prods., Inc.,* 608 So. 2d 937, 938 (Fla. 2d DCA 1992). Generally, "a party has no legal duty to control the conduct of a third person to prevent that person from causing harm to another." *Bing v. Alachua County,* 392 So. 3d 266, 269 (Fla. 1st DCA 2024) (citing *Aguila v. Hilton, Inc.,* 878 So. 2d 392, 398 (Fla. 1st DCA 2004)); *see also Daly v. Denny's, Inc.,* 694 So. 2d 775, 777 (Fla. 4th DCA 1997) (Gross, J., concurring specially) ("The general rule in other jurisdictions is that absent a special relationship, a landowner owes no duty to protect another from intentional criminal acts that occur off the landowner's property"). A duty to protect an unknown plaintiff from a third party's actions may arise, however, if the defendant is in actual or constructive control of (1) the instrumentality of the harm; (2) the premises upon which the tort was committed; or (3) the person who committed the tort. *Bing,* 392 So. 3d at 269 (citing *Aguila,* 878 So. 2d at 398); *see also Daly,* 694 So. 2d at 777. Courts have also recognized that the foreseeable zone of risk may be extended where there is a special relationship between the defendant and the plaintiff. *Cf. Bing,* 392 So. 3d at 272 (discussing situations where the foreseeable zone of risk may be extended and noting

13

that the plaintiff failed to establish or show a special relationship between the defendant and the person who committed the tort or the defendant and the plaintiff).

Here, Bartley contends that it is not responsible for criminal conduct of third parties that occurs off the premises. Bartley asserts that it had no special relationship to Turner or to Menendez, that the attack did not happen on its property, and that it had no control over the instrumentality. And Bartley cites *McCain* for the proposition that it should not be held liable for freak injuries that were unpredictable.

We are not persuaded that Bartley owed no duty to Menendez.[4] Jurists in other jurisdictions have opined that while a person generally has no duty to control the actions of third parties, "the rule has no application if the defendant's failure to act has created an undue risk of harm." *Medina v. Hillshore Partners, Inc.*, 46 Cal. Rptr. 2d 871, 878(Cal. Ct. App. 1995) (Stone, J., dissenting) (citing *Weirum v. RKO Gen., Inc.*, 123 Cal. Rptr. 468, 473 (Cal. 1975)). In *Medina*, a man was walking by an apartment complex when he was accosted by gang members, some of whom resided in the apartment complex. *Id.* at 873. The gang members shot and killed the man off the premises. *Id.* Prior to the shooting, the gang used the apartment complex as their home base to commit criminal offenses; both tenants and law enforcement complained to the landowner. *Id.* The appellants—family members of the decedent— alleged that the landowner negligently maintained and controlled the apartment complex by failing to ensure sufficient security precautions were taken, such as evicting the gang members who lived there or

---

[4] Our conclusion on this issue is limited to the facts of this particular case.

barring gang members from the premises. *Id.* The landowner argued that he had no duty of care because landowners have no duty to protect the public beyond their property line. *Id.* The trial court agreed and dismissed the case with prejudice. *Id.* at 873.

On appeal, the majority framed the question as "whether a landowner owes a duty to protect members of the public from gang members who congregate around an apartment complex and assault individuals on adjacent public streets." *Id.* at 874. The majority rejected such a conclusion, explaining that the landowners had no duty to police the sidewalk and street in front of the complex and that the decedent never entered the apartment complex nor was he assaulted on property controlled by the landowner. *Id.* at 875. Though the majority agreed that "the congregation of gangs poses a foreseeable risk of harm to the public," it went on to conclude that "the foreseeability of the criminal assault does not compel the ruling that landowners owe a duty to protect the public from gang-related crimes or assume a special relationship with members of the public who use adjacent streets and sidewalks." *Id.* at 877.

Judge Stone, in his dissent, disagreed with how the majority framed the issue. Judge Stone opined that the case was not about an assault occurring off the landowner's property but was instead about "a landowner's liability in allowing an alleged known dangerous condition to flourish on its property, which, it is alleged, proximately caused a deadly injury off his property." *Id.* at 878 (Stone, J., dissenting). Judge Stone continued by arguing that the issue was "not whether a landowner is liable for isolated criminal acts of unrelated third parties" but was "whether a landowner owes a duty to protect the public against gang members who congregate on the landowner's property when the

15

landowner has means to prevent the condition." *Id.* (Stone, J., dissenting). Judge Stone opined that the landowner did have control in that case: the control to evict the gang member tenants. *Id.* at 879 (Stone, J., dissenting). Judge Stone also opined that harm was foreseeable because it was alleged that the landowner knew that the gang members congregated on the property and committed violent acts both on and off the property. *Id.* (Stone, J., dissenting).

We agree with Judge Stone's reasoning as applied to this case. The issue here is not whether Bartley had a duty to prevent the criminal actions of Turner or the duty to protect others from injuries occurring off of its property. The issue is whether Bartley was liable for allowing a known dangerous condition to flourish in the townhome when it had the means to evict the residents. The amended complaint alleged that Rick was repeatedly informed both directly by others in the community and via letters from the homeowners' association that the residents of the Bartley townhome were causing disruptions with high traffic and drug use and drug deals and yet nothing was done. The amended complaint also alleged that Rick was seen with the two residents that Bartley claims were squatters. The fact that Bartley did not own the property where the attack occurred or that it did not have control over the instrumentality matters not where Bartley had control over who resided in the Bartley townhome and thus had the ability to correct the known dangerous condition but failed to do so.

With regard to the issue of whether it was reasonably foreseeable that Bartley's inaction by failing to correct the known dangerous condition proximately caused Menendez's injuries, that issue was a question for the fact-finder. *See McCain*, 593 So. 2d at 504. Accordingly, we conclude that the trial court did not err in denying the

16

motion to dismiss the amended complaint for failure to state a cause of action against Bartley.

## II. Motion for Directed Verdict

Turning to the denial of the motion for directed verdict, we employ a de novo review. *Geico Gen. Ins. v. Hoy*, 136 So. 3d 647, 651 (Fla. 2d DCA 2013).

Bartley contends that Menendez failed to prove the essential elements alleged in her amended complaint. Specifically, Bartley argues that there was no evidence that Bartley was renting to the residents in the Bartley townhome. Bartley maintains that they were squatters. Bartley also contends that Menendez failed to establish that any purported duty Bartley had to evict the residents created a foreseeable zone of risk for potential harm to others in the community. Bartley asserts that allegations of drug use and drug deals do not correlate with sexual assault.

Bartley's contention about a lack of proof as to whether the residents of the Bartley townhome were tenants or squatters does not matter to the result here. In either scenario, Bartley still allowed a known dangerous condition to exist (that is, drug use and drug deals), had the means to correct it, and yet failed to do so. There was testimony that Bartley was seen with the Bartley townhome residents on at least two occasions, that his vehicle was seen at the townhome when drug use and drug deals were occurring, and that it appeared to others in the community that the Bartley townhome residents had permission to be there. The jury could infer then that the residents were not squatters but were tenants. Both Turner and the security expert testified that if the residents had been evicted, the attack would not have occurred. That opinion was not dependent on whether the residents were tenants

or squatters. Indeed, the security expert opined that whether the residents were tenants or squatters did not matter because the known dangerous condition existed in either case.

Bartley's proximate cause argument also fails. Bartley focuses on the fact that the complaints discussed drug use and drug deals; Bartley maintains that such criminal activity could not create a reasonable foreseeability that a sexual assault might occur. However, Bartley fails to acknowledge that evidence was presented about *violent* conduct that potentially could and, in this case, did occur at the Bartley townhome. While the direct complaints and the association letters referenced drug use and drug deals, Turner testified that the Bartley townhome was a "drug hole" and that in his experience, it was common to have drug dealing, fighting, and theft at such places. Furthermore, the fact that Turner engaged in a fight at the Bartley townhome just prior to attacking Menendez underscores the obvious: violent conduct not only could happen there, but did happen there. Turner testified that he believed that based on what was happening at the Bartley townhome, it was only a matter of time before someone got hurt.[5] And the security expert likewise testified that given the nature, frequency, and recency of the criminal conduct at the Bartley townhome, the attack on Menendez was reasonably foreseeable.

Even without the occurrence of actual physical violence at the Bartley townhome, the potential for violence existed due to the ongoing drug deals. Courts around the country acknowledge that violence is inherent in drug transactions. *See, e.g.*, *United States v. Foster*, 45 F.3d 428 (4th Cir. 1994); *Diaz v. P'ship, Inc.*, No. 1:21-CV-03661-ELR, 2023

---

[5] There was an objection to the form of the question that elicited this response. However, there was no ruling from the trial court.

WL 10447792, at *16 n.15 (N.D. Ga. April 26, 2023); *United States v. Montoya*, 157 F. Supp. 3d 1157, 1158 (D.N.M. 2016); *Wilson v. State*, 883 S.E.2d 802, 809-10 (Ga. 2023). *But see Belizaire v. Furr*, 36 N.E.3d 1261, 1266 (Mass. App. Ct. 2015) (holding that prior drug activity was insufficient to support a finding of foreseeability as to a shooting). The fact that the battery and sexual assault were different in nature from the fight and drug deals did not entitle Bartley to a directed verdict. *McCain* dictates that "it is immaterial that the defendant could not foresee the *precise* manner in which the injury occurred or its *exact* extent." 593 So. 2d at 503 (citing *Restatement (Second) of Torts* § 435 (1965)). Based on the evidence here,[6] it cannot be said that the only reasonable inference was that the injuries to Menendez were "freak [and] utterly unpredictable in light of common human experience." *Id.* at 503-04. Rather, the evidence was such that reasonable persons could differ as to whether proximate cause was established. And in that case, the issue must be left to the fact-finder. *Id.* at 504.

The evidence as presented was sufficient to withstand the motion for directed verdict, and the trial court did not err in denying it.

We note that within its directed verdict argument, Bartley made a one-sentence conclusory assertion that the specific issue related to proximate cause "should have been properly framed and considered by the jury, pursuant to *McCain*, but the Court failed to give that instruction." Aside from the fact that this appears to be a separate argument related to the adequacy of the jury instructions, Bartley has failed to provide any argument or cite to any authority on the issue. This court will not make arguments for the parties, and we conclude that this

---

[6] Like the issue of duty, our conclusion as to proximate cause is confined to the facts of this case.

issue is waived. *See Polyglycoat Corp. v. Hirsch Distribs., Inc.*, 442 So. 2d 958, 960 (Fla. 4th DCA 1983) (on motion for reh'g) ("When points, positions, facts and supporting authorities are omitted from the brief, a court is entitled to believe that such are waived, abandoned, or deemed by counsel to be unworthy.").

### III.   Motion for JNOV or New Trial

We review a ruling on a motion for judgment notwithstanding the verdict de novo. *Alterra Healthcare Corp. v. Campbell*, 78 So. 3d 595, 601 (Fla. 2d DCA 2011). We generally review rulings on motions for new trial for abuse of discretion. *Marinec v. Progressive Select Ins.*, 351 So. 3d 181, 183 (Fla. 2d DCA 2022).

> [A] JNOV motion alleges that *the evidence* was insufficient to support the verdict at all. When a court is faced with a motion for a JNOV, the court must view all facts and reasonable inferences "in favor of the verdict." *Irven v. Dep't of Health & Rehab. Servs.,* 790 So. 2d 403, 406–07 (Fla. 2001). "A motion for directed verdict or JNOV should be granted only if *no view of the evidence* could support a verdict for the nonmoving party and the trial court therefore determines that no reasonable jury could render a verdict for that party." *New Jerusalem Church of God, Inc. v. Sneads Cmty. Church, Inc.,* 147 So. 3d 25, 28 (Fla. 1st DCA 2013) (emphasis added) (quoting *Lindon v. Dalton Hotel Corp.,* 49 So. 3d 299, 303 (Fla. 5th DCA 2010)).

*Coba v. Tricam Indus., Inc.*, 164 So. 3d 637, 646 (Fla. 2015).

Here, Bartley contends that the motion for JNOV should have been granted based on the same argument it made in the motion for directed verdict, that is, that it owed no duty to Menendez to protect her from an attack by an unknown third party at Menendez's residence. Bartley asserts that the "foreseeable zone of risk" required to establish a legal duty must be narrowly construed. And Bartley contends that it was

20

never on notice of any drug-related violence or of Turner's propensity for violence.

However, Bartley was on notice of a known dangerous condition: continuing drug use and drug deals by the Bartley townhome residents. Testimony reflected that it was common for fights to occur at properties described as "drug holes," the term ascribed to the Bartley townhome. And perhaps more importantly, at least one fight did occur at the townhome, the one preceding the attack on Menendez. Bartley's lack of awareness of the fight does not prevent Bartley from owing a legal duty to Menendez based on the evidence in this case. The attack was not "utterly unpredictable in light of common human experience" especially because violence is inherent in drug transactions, and it is undisputed that drug deals were a continuous problem at the townhome. At most, reasonable persons could differ as to whether proximate cause was established. But the standard for a JNOV is that there must be no view of the evidence that could support a verdict for the nonmoving party, *Coba*, 164 So. 3d at 646, and here, we conclude that that standard was not met.

Turning to the motion for new trial, Bartley contends that the manifest weight of the evidence was contrary to the verdict because Menendez failed to present any evidence to establish proximate cause as delineated in *McCain*. Because we have already rejected this argument, we need not readdress it.

The motion for JNOV and new trial was properly denied.

### IV. Motion for setoff

Bartley asserts that the trial court erred by denying its motion for setoff. Bartley notes that Menendez settled with the other two original defendants for $4,000,000 and then amended the style of the case to

21

remove them. Bartley argues that because the jury verdict rendered against it was in the amount of $3,500,000, the settlement amount should be applied as a setoff against the jury verdict, thereby resulting in a $0 judgment against Bartley. The trial court denied the setoff motion, citing section 768.81(3), *Gouty v. Schnepel*, 795 So. 2d 959 (Fla. 2001), and *Wells v. Tallahassee Memorial Regional Medical Center*, 659 So. 2d 249 (Fla. 1995). Bartley acknowledges *Gouty* and *Wells*, but it argues that if we adhere to those decisions, we should certify a question of great public importance as to whether the setoff statutes[7] remain applicable despite the elimination of joint and several liability in negligence cases in favor of comparative fault where the setoff statutes have never been amended and have continued to be applied in other types of cases.

In *Gouty* and *Wells*, the Florida Supreme Court recognized that with the enactment of section 768.81, Florida Statutes (2000), the legislature eliminated joint and several liability in favor of comparative fault[8] in most cases with limited exceptions. *Gouty*, 795 So. 2d at 961; *Wells*, 659 So. 2d at 252-53. We need not determine whether *Gouty* and *Wells* control this case. Nor do we find this case appropriate to certify a question of great public importance regarding the applicability of the setoff statutes in light of section 768.81.

---

[7] These are being cited generally as sections 46.015(2), Florida Statutes (2023), 768.31(5), and 768.041(2).

[8] Under a comparative fault analysis, "as long as a defendant does not pay more than his or her percentage of fault, that defendant is not entitled to contribution from another tortfeasor or entitled to a setoff from a settling defendant." *Gouty*, 795 So. 2d at 964.

This is because Bartley failed to seek to add the other two original defendants to the verdict form as *Fabre*[9] defendants, failed to assert as an affirmative defense that the other two original defendants were joint tortfeasors, and failed to present evidence at trial that the negligence of the other two original defendants contributed to the attack. Instead, Bartley only specifically designated Turner as a *Fabre* defendant in its affirmative defenses, and Bartley was the only entity listed on the verdict form. Furthermore, Bartley affirmatively asserted to the trial court at trial that it was "not taking the position that [the other two original defendants] were responsible" and that it was not "pointing the finger at them." Bartley's position was simply that it was not negligent.

Under these facts, Bartley waived any entitlement to a setoff from the other two original defendants. *Cf. Nash v. Wells Fargo Guard Servs., Inc.*, 678 So. 2d 1262, 1265 (Fla. 1996) (concluding that appellee waived defense that noneconomic damages should be apportioned to a proposed *Fabre* defendant where appellee's answer did not include an affirmative defense that the proposed *Fabre* defendant's negligence contributed to the plaintiff's injuries, where the appellee did not raise the defense during a pretrial conference, and where the appellee asserted throughout the trial that the proposed *Fabre* defendant's negligence was not at issue); *Am. Prime Title Servs., LLC v. Wang*, 317 So. 3d 1183, 1189 (Fla. 3d DCA 2021) (Scales, J., dissenting) (explaining that "[a] non-settling defendant must allege entitlement to setoff as an affirmative defense or the right is waived" and that "the plain text of the setoff statutes clearly

---

[9] *Fabre v. Martin*, 623 So. 2d 1182, 1187 (Fla. 1993) (recognizing that all tortfeasors should be included in the apportionment question presented to the jury regardless of whether they are parties to the suit), *receded from on different grounds by Wells*, 659 So. 2d at 254.

dictates that the non-settling defendant establish the right to setoff at *trial*").  Indeed, in order for a defendant to obtain the benefit of comparative fault and to allocate any or all fault to nonparties, section 768.81(3)(a)1 requires a defendant to "affirmatively plead the fault of a nonparty and, absent a showing of good cause, identify the nonparty, if known, or describe the nonparty as specifically as practicable, either by motion or in the initial responding pleading when defenses are first presented, subject to amendment any time before trial."  Section 768.81(3)(a)2 also requires that for a named or unnamed nonparty on the verdict form, "a defendant must prove at trial, by a preponderance of the evidence, the fault of the nonparty in causing the plaintiff's injuries." But here, Bartley did not meet the requirements of section 768.81(3)(a)1 and 2.  The jury was only asked to determine the liability of Bartley, and it did so.  Bartley cannot now seek relief from its own strategic decision. *See Salazar v. Gomez*, 317 So. 3d 170, 172 (Fla. 3d DCA 2021) (explaining that where a party's strategy backfires, that party is not entitled to a new trial (relying on *KMart Corp. v. Hayes*, 707 So. 2d 957, 958 (Fla. 3d DCA 1998))).

## CONCLUSION

We conclude that the trial court did not err in denying Bartley's motion to dismiss, motion for directed verdict, motion for JNOV or new trial, and motion for setoff.  Accordingly, we affirm.

Affirmed.

NORTHCUTT and BLACK, JJ. Concur.

———————————————

Opinion subject to revision prior to official publication.